UNITED STATES of America

v.

Norman ARCHER et al., Defendants.

No. 72 Crim. 849.

United States District Court,
S. D. New York.

Dec. 18, 1972.

Whitney North Seymour, Jr., U. S. Atty. for Southern Dist. of New York, Rudolph W. Giuliani, James P. Lavin, Asst. U. S. Attys., of counsel.

James M. La Rossa, New York City, for Archer.

Shea, Gould, Climenko & Kramer, New York City, for Klein. Milton S. Gould, Ronald H. Alenstein, Robert Gold, New York City, of counsel.

Selig Lenefsky, New York City, for Wasserberger.

## OPINION

TENNEY, District Judge.

In this two count indictment defendants have been charged with conspiring to use a facility in interstate commerce, that is, the telephone, with intent to carry on the unlawful activity of bribery in violation of the Travel Act, 18 U.S.C. § 1952 (1970), and aiding and abetting and conspiracy statutes, 18 U.S.C. §§ 2 and 371 (1970).

Briefly, the indictment charges as follows: On February 29, 1972, a Special Agent of the Bureau of Narcotics and Dangerous Drugs, United States Department of Justice, acting in an undercover capacity under the name of "Salvatore Barone," was arrested at the Omaha Diner in Queens, New York, by a New York City Police Department patrolman for unlawful possession of two loaded pistols. Barone was arraigned later that same day and was released on bail. Thereafter, he obtained several adjournments of his case for the stated purpose of obtaining an attorney. On April 19, 1972, defendant Wasserberger, an associate of a bondsman with offices in New York, introduced Barone to defendant Klein, an attorney with offices in Queens, for the purpose of retaining Klein as Barone's attorney and for the purpose of arranging for the dismissal of the charges against Barone by corrupt means. Klein, it is alleged, guaranteed Barone that his case would be fixed at the grand jury stage of the proceedings by defendant Archer, the Assistant District Attorney in charge of the Indictment Bureau in the office of the District Attorney for Queens County, in return for $15,000 in cash. On that same day, Barone is alleged to have given Klein and Wasserberger $500 in cash as a down payment. Thereafter, Archer

is alleged to have agreed to the scheme and he, Klein and Wasserberger provided Barone with a false exculpatory explanation of his possession of the two loaded pistols to testify to before the Queens County grand jury. On May 8, 1972, Barone allegedly paid Klein the remaining balance of $14,500 of the $15,000 in cash, a portion of which was allegedly paid to Archer on May 10, 1972. On May 9, 1972, it is alleged that Archer knowingly permitted Barone to testify falsely before the grand jury.

The case presently is before this Court on defendants' motion (1) to dismiss the indictment (a) for lack of jurisdiction under § 1952 and (b) for prosecutorial misconduct with regard to pre-indictment publicity and/or for a hearing to determine the source of the pre-indictment publicity and, pursuant to Fed.R.Crim.P. 6(e), for inspection of the grand jury minutes; (2) pursuant to Fed.R.Crim.P. 7(d), to strike page one of the indictment as surplusage; (3) pursuant to Fed.R.Crim.P. 41(e), to suppress (a) certain statements made by the defendants, or for a hearing to determine their voluntariness, (b) wiretap evidence, (c) evidence seized at defendant Archer's home pursuant to warrant; (4) pursuant to Fed.R.Crim.P. 7(f), for a bill of particulars; (5) pursuant to Fed.R.Crim.P. 16, for discovery and inspection, including materials produced under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (6) for a severance under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 476 (1968).

*(1) Motion to Dismiss Indictment*
*(a) Lack of Jurisdiction under § 1952*

Defendants contend, as the basis for their motion, that jurisdiction of the instant case does not lie under § 1952 because the indictment fails to allege (1) that the defendants were involved in a business enterprise of which bribery was an integral part; (2) that the unlawful activity alleged herein was connected with organized crime; and (3) that the use of interstate facilities was

central and vital to the crime rather than merely incidental to it. With regard to this last contention, defendants argue that any interstate element of the crime alleged was contrived solely by the Government. For the reasons cited *infra*, the motion is denied.

Section 1952 provides:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, [or controlled substances (as defined in section 102(6) of the Controlled Substances Act),] or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States."

██ With regard to their first contention, defendants argue that in order for jurisdiction to lie under § 1952, the Government must allege and prove that the defendants were engaged in a continuous course of illegal conduct, a "business enterprise", of which bribery was an integral part. Here, they argue, the indictment alleges only one, isolated act of bribery. Section 1952(b), however, defines the "unlawful activity" prohibited by § 1952(a) as falling into two categories: "(1) any business enterprise involving gambling . . . [and other offenses], *or* (2) . . . bribery. . . ." (Emphasis added.) The "business enterprise" requirement is conspicuously absent from the second category of unlawful activity defined in § 1952(b)(2). *See* United States v. Mahler, 442 F.2d 1172, 1174–75 (9th Cir.), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971); Marshall v. United States, 355 F.2d 999 (9th Cir.), cert. denied, 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54 (1966). Therefore, notwithstanding any legislative history cited by defendants to the contrary, the clear and unequivocal language of the statute and supporting case law do not support their position.

██ With regard to their second contention, defendants urge that § 1952 was intended exclusively to curtail the unlawful activities of organized crime; here, they claim, no connection between the defendants and organized crime has been alleged. This argument is without merit. Even assuming that § 1952 was *aimed* at organized criminal activity, if Congress had intended the statute to apply *only* to organized crime, it would of necessity have included a definition of "organized crime" in the statute; otherwise, courts would be faced with the insurmountable task of determining exactly to whom the statute applies. This Court looks in vain for such a definition. Even in Rewis v. United States, 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), a case heavily relied on by the defendants, the Supreme Court stated "that § 1952 was aimed *primarily* at organized crime." (Emphasis added.) Case law reveals many instances in which individuals have been convicted under the Travel Act for bribery and extortion offenses who had absolutely no relationship to organized crime. *See, e. g.*, United States v. Pordum, 451 F.2d 1015 (2d Cir. 1971), cert. denied, 405 U.S. 998, 92 S.

Ct. 1249, 31 L.Ed.2d 467 (1972); United States v. Mahler, *supra,* 442 F.2d 1172. Indeed, even in prosecutions under § 1952(b)(1), in which a "business enterprise" must be shown, there is no necessity to prove that a defendant was associated with an organized crime syndicate; a continuous course of conduct by a petty hoodlum acting alone is sufficient. Spinelli v. United States, 382 F. 2d 871, 889–890 (8th Cir. 1967) (en banc), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■ With regard to their third contention, defendants submit that the crime alleged herein was essentially local in character, and rely on Rewis v. United States, *supra,* 401 U.S. 808, 91 S.Ct. 1056; United States v. Altobella, 442 F. 2d 310 (7th Cir. 1971); and United States v. McCormick, 442 F.2d 316 (7th Cir. 1971), to support their contention that any use of interstate facilities in the instant case was so minimal and incidental to the crime charged as to deprive this court of jurisdiction under § 1952. Moreover, defendants argue that the only interstate element of the crime was provided by the Government through Barone who, it appears from the Government's brief, was posing as a "hit man" from the so-called "Mafia" from Las Vegas, Nevada.

The indictment sets forth three uses of an interstate facility by the defendants:

"OVERT ACTS

.    .    .    .    .    .

4. On or about April 25, 1972, the defendant FRANK R. KLEIN spoke on the telephone with Barone in a transatlantic call between Queens, New York and Paris, France.

5. On or about April 27, 1972, the defendant FRANK R. KLEIN made a telephone call from his office in Queens, New York to Barone at the Holiday Inn, Newark, New Jersey.

.    .    .    .    .    .

7. Between on or about April 27, 1972, and on or about May 5, 1972, the defendant LEON WASSERBERGER placed a telephone call to Barone, from WASSERBERGER'S office at 75 Baxter Street, New York, New York to the Sahara Hotel, Las Vegas, Nevada."

There is authority for the proposition that § 1952 does not require the use of the interstate facility to be an integral part or essential to the unlawful activity. United States v. Barrow, 363 F.2d 62, 65 (3d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). But even if there were such a requirement, in the context of an indictment which charges a total of four meetings between Barone and the defendants, three interstate and foreign telephone calls would appear to be a relatively significant use of interstate and foreign facilities. Furthermore, the defendants allegedly all "knew" that Barone resided outside New York State and therefore it would seem that contact with him by the use of interstate facilities was necessary and foreseeable within the context of their agreement. United States v. Corallo, 413 F.2d 1306, 1325 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969). Thus, it could be said that the use of interstate telephone calls was "not a casual and incidental occurrence but the fulfillment of an integral part of the conspiratorial consensus." *Id.* at 1325.

Defendants' reliance on *Rewis, Altobella* and *McCormick, supra,* is misplaced; those cases involved interstate travel or use of an interstate facility by the *victims* of the crime and not, as here, by the actual defendants. The statute prohibits the use of interstate facilities by a *defendant* in the broadest possible terms. This distinction is recognized in *Rewis, supra,* 401 U.S. at 813, 91 S.Ct. 1056, which cites with approval cases in which federal courts have correctly applied § 1952 to individuals who themselves or through their agents crossed state lines in furtherance of ille-

gal activity. Likewise, the statute is equally applicable to those who themselves use an interstate facility in such circumstances.

The defendants argue additionally that the indictment should be dismissed because it was solely Barone's presence outside the State of New York which gave the telephone calls their interstate character. It appears from the face of the indictment that the call described in Overt Act 4 was initiated by the Government, and in its brief the Government concedes that the call described in Overt Act 5 was made by defendant Klein in direct response to a call from Barone from New Jersey. If only these two calls were involved, this Court would have some reservations about the propriety of federal jurisdiction in this case. However, the third call described in Overt Act 7 allegedly was made by defendant Wasserberger on his own in order to advise Barone that the latter's grand jury appearance was postponed.

█ █ Section 1952 contains no requirement that a defendant use an interstate facility on any specific number of occasions; rather, the statute prohibits *any* use of an interstate facility to carry out the crime of bribery. Thus, this Court finds that one such use is sufficient, so long as it is used with the intent to carry on an unlawful activity and is followed by an attempt to perform any of the acts prohibited by the statute. *See* United States v. Wechsler, 392 F.2d 344, 347 (4th Cir.), cert. denied, 392 U.S. 932, 888 Ct. 2283, 20 L. Ed.2d 1389 (1968). At best, the fact that some of the calls were initiated by the Government might amount to a jury issue on entrapment, but would not justify dismissal of the indictment at this stage of the proceedings. *Cf.* United States v. De Sapio, 299 F.Supp. 436, 449 (S.D.N.Y.1969), aff'd, 435 F.2d 272 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

*(b) Pre-Indictment Publicity*

Defendants move to dismiss the indictment on the additional ground that widespread publicity (allegedly willfully and intentionally created by the Government), which saturated the media immediately prior to and during the grand jury's deliberations in the presentation of the case herein, tainted the entire grand jury proceeding thereby rendering the resulting indictment constitutionally invalid. Defendants cite fifteen news articles and one editorial appearing in various New York newspapers between June 16 and July 1, 1972, which reported rumors of an investigation concerning widespread official corruption in various local prosecutorial and judicial offices. The articles first linking defendants to the broader probe of official wrongdoing appeared on June 28, 1972, almost one month before the indictment was handed down on July 25, 1972.

█ Defendants concede that there is much authority for the proposition that pre-indictment publicity is not inherently prejudicial and that, therefore, a defendant must demonstrate actual prejudice, *i. e.*, he must show that the return of the indictment itself was a denial of due process, before such an indictment against him will be dismissed. *See, e. g.*, Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); United States v. Nunan, 236 F.2d 576, 593 (2d Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665 (1957); United States v. Anzelmo, 319 F.Supp. 1106, 1113–1114 (E.D.La.1970); United States v. Dioguardi, 20 F.R.D. 33, 35 (S.D.N.Y. 1956). However, they submit that the "inherent prejudice" test adopted by the Supreme Court in Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966), with regard to pretrial publicity should be extended to cover pre-indictment publicity when that publicity is of the breadth and scope presented in this case. Alternatively, they argue that the inherent prejudice rule should apply when the publicity is the direct result of prosecutorial misconduct, *i. e.*, where the Government has deliberately "leaked" information to the

press in order to inflame the general public and to gain a tactical advantage over a defendant before the grand jury. Additionally, defendants urge that, should this Court not adopt the inherent prejudice test, they should be given an opportunity for a hearing together with an opportunity to inspect the grand jury minutes to develop a showing of actual prejudice. For the reasons cited *infra,* both the motion to dismiss and alternative requests are denied.

■ Defendants appear to concede that the majority rule is that a defendant has no constitutional right to an impartial grand jury, *see, e. g.,* Gorin v. United States, 313 F.2d 641, 645 (1st Cir. 1963), cert. denied, 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965), and state that they do not adopt the burden of establishing to this Court's satisfaction that the indictment was not constitutionally valid because of the mere fact that the publicity complained of appeared. Rather, because the Supreme Court has yet to consider the import of *Estes* and *Sheppard, supra,* in a pre-indictment publicity case, and in order to preserve this issue, defendants assert that due to the scope and magnitude of the attendant publicity, under the inherent prejudice rule developed in *Estes* and *Sheppard* such publicity has rendered a fair trial constitutionally impossible. The weight of defendants' argument at this time, therefore, centers on the issue of prosecutorial misconduct.

With regard to this point, defendants assert that an evidentiary hearing would reveal that the pre-indictment publicity herein was intentionally created by the Government in a sophisticated attempt (1) to pressure either one or more of the defendants into cooperating with the Government in their continuing investigation of official corruption, and (2) to create an atmosphere of hostility which carried over to the grand jury proceedings. An examination of the grand jury minutes, they submit, would reveal the direct and prejudicial effect of the Government's scheme.

In support of defendants' sweeping charge of prosecutorial misconduct, this Court notes only two items worthy of discussion. The first is that after news reports of an intensive investigation of official misconduct through the use of undercover agents there developed a well-publicized conflict between the United States Attorney's Office for the Southern District of New York and two of New York's daily newspapers. Government attorneys asserted that the media's leak of the pending investigation frustrated their efforts, while the newspapers counter-charged that the United States Attorney had already disclosed all of the relevant details of that investigation to a national magazine. But the "disclosure", it appears, was the granting of an interview with an undercover agent to the magazine on condition that the report of the interview not be published until after the close of the investigation, which is in fact what occurred. Moreover, from the excerpt submitted to this Court by defendants, it appears that the article was a general report on what it was like to be an undercover agent, rather than a report on the particulars of the investigation. Indeed, the article itself states: "There is no effort here to describe the investigation or its results. Some of the details about cases have been altered to protect the rights of prospective defendants and others." The second item defendants point to is in one of two articles in two daily newspapers on June 28, 1972, the first day defendants were linked to the general investigation, which contained a reference to "informed sources." However, the information appearing in both articles was based upon public records, *i. e.,* federal search warrants filed in the United States District Court for the Eastern District of New York.

■ Government-inspired leaks of information to the press and the relief to which such conduct entitles a defendant are issues which have been presented to the federal courts in the past. The cases, however, have variously held that the prejudicial effect of the publici-

ty, rather than its source, is the sole question to be determined, United States v. Hoffa, 205 F.Supp. 710, 717–718 (S. D.Fla.1962); United States v. Dioguardi, *supra*, 20 F.R.D. at 34–35; that the charges of prosecutorial misconduct were unsubstantiated, United States v. Kahaner, 204 F.Supp. 921, 922–923 (S. D.N.Y.1962); or that any publicity complained of was not serious enough to warrant dismissal of the indictment. Gorin v. United States, *supra*, 313 F. Supp. at 644–645. While a situation possibly could exist where prosecutorial misconduct in releasing information to the press would be so prejudicial as to warrant dismissal of an indictment against a defendant, *cf.* United States v. Sweig, 316 F.Supp. 1148, 1153–1155 (S.D. N.Y.1970), that situation is not presented by the instant case.

■ Here, even if there were leaks to the press by the United States Attorney's Office—which the Government denies in its affidavit—as to the first item mentioned above, since the information in the magazine article in question was not of a prejudicial nature and in any case, does not appear to have been released until after the indictment was handed down, and as the second item, which contains only a vague reference to "informed sources," sets forth no information which was not a matter of public record, and for that reason, even if the "informed sources" were government officials, the disclosures in question were not made in violation of Local Criminal Rule 8, the "Free Press—Fair Trial" rule, this Court cannot say that a prima facie showing of prosecutorial misconduct with reference to pre-indictment publicity has been made. Therefore, an evidentiary hearing is not necessary since, even assuming defendants proved their assertions, no relief would be warranted.

■ Likewise, an inspection of the grand jury minutes is not warranted at this time. The type and amount of publicity in this case is not sufficient to support defendants' bald assertion of possible bias on the part of the grand jury sufficient to lead to a lack of due process in handing down the indictment. Indeed, in cases where pre-indictment publicity was on a much larger scale than presented here, motions for pretrial inspection of the grand jury minutes have been denied. *See, e. g.*, United ed States v. Sweig, *supra*, 316 F.Supp. at 1155; United States v. De Sapio, *supra*, 299 F.Supp. at 449; United States v. Baker, 262 F.Supp. 657, 670 (D.D.C. 1966).

### (2) Motion to Strike

■ Defendants move under Fed.R.Crim.P. 7(d) to strike page one of the indictment as surplusage. The three-paragraph "Introduction" to the indictment contained on that page identifies Barone as an undercover agent and outlines the facts surrounding his arrest on the weapons charge. "A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter." Dranow v. United States, 307 F.2d 545, 558 (8th Cir. 1962). Here, the introduction serves merely to clarify the remainder of the indictment and in no way contains any matter inflammatory or prejudicial to the defendants.

### (3) Motions to Suppress

### (a) Defendants' Statements

All three defendants move to suppress any statements made by them or, alternatively, for a pre-trial hearing to determine (1) the voluntariness of such statements and (2) whether defendants were advised of their constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant Wasserberger in particular contends that he made no voluntary incriminating statement and, moreover, that he was never given his *Miranda* warnings. Defendant Archer concedes that he made statements to the

Government, but asserts that, although he was not under arrest at the time, he was "in custody" and that any statements made by him were involuntary because the Government employed the media in an attempt to secure admissions by subjecting him to shame and ridicule; moreover, he asserts that any statements obtained from him at that time, prior to his retaining counsel, were obtained in violation of his sixth amendment rights.

■ The motion for a hearing is granted to the extent that, if the Government intends to offer any statements of the defendants in evidence at trial, the Court will hold a suppression hearing on the scheduled trial date immediately before selection of the jury.

### (b) Wiretap Evidence

■ Defendants' motion pursuant to Fed.R.Crim.P. 41(e) to suppress wiretap evidence is denied. The Government has represented to this Court that no wiretap or eavesdropping devices were employed except that recordings were made with the consent of Barone of certain conversations he had with the defendants. Case law indicates that such a representation by the Government is sufficient grounds for denial of a motion to suppress. United States v. De Sapio, *supra*, 299 F.Supp. at 449.

### (c) Real Evidence

Defendant Archer moves, also pursuant to Fed.R.Crim.P. 41(e), to suppress all evidence seized from his home pursuant to a search warrant issued on June 16, 1972, claiming that the affidavit supporting the warrant failed to state probable cause in violation of the fourth amendment. Additionally, defendant contends that the execution of the warrant exceeded its designated scope and purpose and resulted in a far broader search than was sanctioned. For the reasons cited *infra*, the motion is denied.

The affidavit in question showed that a Bureau of Narcotics and Dangerous Drugs agent acting in an undercover capacity paid defendant Klein $17,000 in recorded bribe money and that the last payment of $2,000 was made on June 12, 1972, four days before the warrant was issued. The affidavit also disclosed that Klein had told the undercover agent that he (Klein) had t pay a bribe to defendant Archer in order to fix the case. On the very day Klein had told the undercover agent he was going to "pay off" Archer the affidavit states that the following observations were made: Klein was observed entering the bank where he previously had deposited a portion of the bribe money. Klein then left the bank, met with defendant Archer, and after the meeting was concluded, Archer returned directly to his office where he remained until after banking hours. The affidavit further states that Klein informed the undercover agent, Barone, that the $2,000 bribe paid on June 12, 1972, was to be given to Archer to fix a pending case.

Here, an Assistant District Attorney holding an executive position in the Queens District Attorney's Office allegedly had received bribe money totalling over $10,000. Approximately $2,000 of that money was received a mere four days before the warrant was issued. In view of this, the Magistrate was asked in effect to conclude that it would be highly probable that an experienced law enforcement officer such as Archer would keep the money in his home rather than chance almost certain discovery, or at the least, cause suspicion, should he try to deposit this cash in a bank.

■ In United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L. Ed.2d 684 (1965), the Supreme Court stated:

"[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and real-

istic fashion. . . . Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

This rule was recently reaffirmed in United States v. Harris, 403 U.S. 573, 577, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). In the instant case the affidavit contains the underlying "facts or circumstances" from which the magistrate could find probable cause, Nathanson v. United States, 290 U.S. 41, 47, 54 S.Ct. 11, 78 L.Ed. 159 (1933), and explained how the informant came by his information. Spinelli v. United States, *supra*, 393 U.S. at 416, 89 S.Ct. 584. Although the information that defendant Klein was planning to "pay off" defendant Archer was hearsay, such was corroborated by the independent observations of other agents of Klein first entering the bank where he previously had deposited the bribe money, then meeting with defendant Archer, after which Archer returned directly to his office where he remained until after banking hours. *See* Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

In United States v. Lucarz, 430 F.2d 1051 (9th Cir. 1970), the defendant, a postal employee, signed a receipt on February 10th for a mail pouch containing the proceeds of the previous day's sale of stamps. Later that day he reported that the pouch had been cut and the contents missing. The $20,000 in proceeds was recovered as a result of a search of the defendant's home under a warrant issued on February 15th. The affidavit in support of the warrant showed that the defendant was not seen taking the mail to his house, nor did anyone see the stolen goods there. The court, in upholding the warrant, stated:

"The situation here does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." (Citations omitted.) *Id.* at 1055.

In sum, the magistrate need not be *convinced* that goods are in a particular place, Jones v. United States, *supra*, 362 U.S. at 271, 80 S.Ct. 725, but rather, all that is required is that he have a "substantial basis" for concluding that specified property is probably where the warrant says it is. Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). That test has been met here.

Defendant argues additionally that the scope of the search exceeded that authorized by the warrant. The Government has represented to this Court by affidavit that it intends to offer only the money seized at defendant Archer's home which was specified in the warrant. Any other items seized evidently have been returned to the defendant and will not be used at trial. Therefore, it is not necessary for the Court to rule on this portion of defendant's motion to suppress.

### (4) Motions for Bill of Particulars

With regard to defendant Archer, the following items requested are granted insofar as they are consented to by the Government: as to Count 1, items c, j through o inclusive, r through t inclusive, v through ii inclusive, and ll through oo inclusive; as to Count 2, item pp. The following items requested are denied: as to Count 1, items a, b, d through i inclusive, p, q, u, jj and kk; as to Count 2, item qq.

With regard to defendant Klein, the following items requested are granted insofar as they are consented to by the Government: 1, 3, 7, 11, 14, 17, 22(a),

23(c), –(g), and –(h)(i) through –(vii) inclusive, 24, 29(a) through –(c) inclusive, 30, 32, 34(a), 35(a) and –(b), 36(a), 38, 39, 42, 43 and 46. The following items requested are denied: 2, 4 through 6 inclusive, 8 through 10 inclusive, 12, 13, 15, 16, 18 through 21 inclusive, 22(b) through 23(b) inclusive, 23 (d) through –(f) inclusive, 23(h)(viii), 25 through 28 inclusive, 29(d), 31, 33, 34 (b) through –(e) inclusive, 35(c) through –(e) inclusive, 36(b) through 37 inclusive, 40, 41, 44, 45, 47 and 48.

With regard to defendant Wasserberger, the following items are granted insofar as they are consented to by the Government: as to Count 1, items 4, 16 and 17; as to Count 2, items 1 and 2. The following items requested are denied: as to Count 1, items 1 through 3 inclusive, 5 through 15 inclusive, 18 and 19; as to Count 2, item 3.

### (5) Motions for Discovery and Inspection

With regard to defendant Archer, discovery is allowed as to the following items insofar as they are consented to by the Government: 1, 3, 4, 6, 17, 22 first sentence and 23. The following requests are denied: 2, 5, 7 through 16 inclusive, 18 through 21 inclusive and 22 second sentence.

With regard to defendant Klein, discovery is allowed as to the following insofar as consented to by the Government: 1 through 4 inclusive, 10, 12 and 14. The following requests are denied: 5 through 9 inclusive, 11, 13 and 15.

With regard to material under Brady v. Maryland, supra, 373 U.S. 83, 83 S.Ct. 1194, the usual procedure is that defendants are entitled to such material at the close of the Government's case.

### (6) Motions to Sever

Each defendant moves to sever his trial from that of his co-defendants under the authority of Bruton v. United States, supra, 391 U.S. 123, 88 S.Ct. 1620. The Government has consented to a severance of the trial of defendant Archer from that of defendants Klein and Wasserberger. The motion, there-fore, is granted insofar as the Government consents. The trial of defendants Klein and Wasserberger will proceed on January 15, 1972. Defendant Archer's trial will immediately follow that of his co-defendants.

Therefore, and for the foregoing reasons, defendants' motions (1) to dismiss the indictment (a) for lack of jurisdiction and (b) for prosecutorial misconduct with regard to pre-indictment publicity and/or for a hearing to determine the source of the pre-indictment publicity and for inspection of the grand jury minutes; (2) to strike page one of the indictment as surplusage; and (3) to suppress wiretap evidence and real evidence seized at defendant Archer's home are in all respects denied. The motions for a bill of particulars, discovery and inspection and a severance are granted insofar as consented to by the Government and denied as to all else. As to the motions to suppress certain of defendants' statements, if the Government intends to use any statements of the defendants at trial, this Court will hold a suppression hearing on the trial date before impanelling the jury.

So ordered.