Marion S. **BARRY**, Jr., Plaintiff,

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 87–1692–AER.

United States District Court, District of Columbia.

June 27, 1990.

---

Herbert O. Reid, Marlene L. Johnson, Washington, D.C., for plaintiff.

U.S. Atty. Jay B. Stephens, Asst. U.S. Attys. John D. Bates, Michael L. Martinez, John C. Cleary, Washington, D.C., for defendants.

### MEMORANDUM

AUBREY E. ROBINSON, Jr., Chief Judge.

In *Barry v. United States*, 865 F.2d 1317 (D.C.Cir.1989), the Court of Appeals remanded this case for a determination whether defendants unlawfully disclosed grand jury secrets as alleged by plaintiff. Reversing this Court's finding that plaintiff had not made out a *prima facie* case of such disclosures, the court above ordered an evidentiary hearing, at which defendants "may respond to Mayor Barry's allegations." *Id.* at 1326. This hearing took place May 4, 1990. Following a review of the entire record in this matter, and for the reasons that follow, the Court finds that the Government did not violate Fed.R.Crim. Pro. 6(e) as alleged. Consequently, the Court will dismiss plaintiff's claims and enter judgment in defendants' favor.

### I. *Scope of Plaintiff's Case on Remand*

Plaintiff asserts that his *prima facie* case was not limited to any particular time period or set of news reports, relying in large part upon his and the Court of Appeals' references to the possibility of a "pattern or practice" of illegal grand jury disclosures.[1] In contrast, the Government attempts to limit this Court's consideration of the pattern or practice allegation to the period following mid–1987, and to limit plaintiff's case generally to a fixed universe of some thirty-four newspaper articles.[2]

The answer lies somewhere in between. The Court of Appeals was not particularly clear on the extent, or indeed the consequence, of plaintiff's *prima facie* case. There is no question that one article, *Mayor of Washington is Subject of Perjury Inquiry by Grand Jury*, N.Y. Times, Aug. 29, 1984, at A1, col. 3, "constituted a *prima facie* violation of Rule 6(e)(2)." *Barry*, 865 F.2d at 1325. Upon this finding, the Court of Appeals directed this Court "to look further into this violation ... in order to determine whether there has been a pattern or practice of impermissible disclosures of grand jury materials which, if proven, would justify civil contempt sanctions and/or injunctive relief under Rule 6(e)(2)." *Id.*

Two other articles "raise[d] questions regarding possible improper Government disclosures:" *Ex–City Worker is Jailed After Refusing to Testify*, Washington Post, Aug. 10, 1984, at A1, col. 4, and *Karen Johnson Jailed for Contempt, Loses Job*, Washington Times, Aug. 10, 1984, at 1A, col. 3. Thus, the New York Times article clearly made out a *prima facie* case, and the *Post* article "suggests the same." *Barry*, 865 F.2d at 1325–26.

---

1. Initially, in preparation for the evidentiary hearing following remand, plaintiff sought to present additional materials relating to more recent events, which materials he asserted would bolster his case. At the hearing, however, plaintiff abandoned this effort and stated unequivocally that he would "stand on the record" as it is currently constituted.

2. Actually, the Government attempts to cut down the number of articles now before the Court further by arguing that Plaintiff "abandoned" nine on appeal, and that seven were "exonerated" in a separate but similar case, *In re Sealed Case*, 865 F.2d 392 (D.C.Cir.1989). The Court rejects both of these claims.

First, when plaintiff compiled his appendix on appeal, he allegedly omitted nine articles he had originally presented to this Court. The record on appeal, however, consists of the entire record before the District Court, *see* Fed.R.App. Pro. 10(a), and not solely what a party focuses upon by way of appendix. These articles will be considered.

With respect to the second claim, it is true that *In re Sealed Case* upheld this Court's finding that seven articles published between May 23, 1987 and May 28, 1987 did not give rise to any inference of unlawful Government disclosure. As is pointed out in the text below, however, the Court of Appeals in this case specifically referred to the "whole spectrum of articles" in the record. In keeping with a reasonable interpretation of this language, and in the interest of caution, the Court will reexamine each of the articles before the Court of Appeals, including these seven.

Finally, the Court of Appeals noted the "whole spectrum of news articles" before it, in which "[t]he precise attribution of a source in one ... may give definition to a vague source reference in others because of their context in time or content." *Id.* (quoting *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 219 (5th Cir.1980)).

This Court finds that a fair and honest reading of the language chosen by the Court of Appeals requires a reexamination of all of the news articles presented. Had the court above meant to limit the inference of unlawful disclosure to one article as the Government suggests, its reference to a possible pattern or practice would have been completely unnecessary. The Government's claim that plaintiff has pleaded the alleged pattern or practice as beginning in 1987 is denied by the Court of Appeals' direction that it be considered in connection with the 1984 New York Times article. While plaintiff is correct, therefore, that his pattern or practice allegation extends to the 1984 materials, his case is indeed limited to the articles presented to the Court of Appeals.

At this juncture, rather than with a view toward the establishment of a *prima facie* case, the Court's task is to review the entirety of the record, now including the Government's evidentiary materials, to determine the ultimate question for decision: whether by pattern, practice or otherwise, "the [defendants] have unlawfully disclosed matters occurring before the grand jury." *Barry*, 865 F.2d at 1326.

## II. *The Merits*

■ The establishment of plaintiff's *prima facie* case shifted the burden to the Government "to come forward with evidence to negate" plaintiff's showing. *United States v. Eisenberg*, 711 F.2d 959, 964 (11th Cir.1983). The Court of Appeals here recognized the justification for this exercise: the Government "must now re-spond, because they are in the 'best position to know whether [they are] responsible for a violation' of the Rule." *Barry*, 865 F.2d at 1326 (quoting *Lance*, 610 F.2d at 219). More specifically, what the Government "knows" or can determine in this regard is what actually occurred before the grand jury, whether the purported grand jury disclosures are accurate, the identities of its employees with access to any of the grand jury information disclosed, and whether these individuals in turn provided any such information to the media. The Government's response, which meets the burden assigned it and negates the *prima facie* case, is as follows:

### A. The August 29, 1984 New York Times Article

This article opens with an unattributed statement that a federal grand jury is "looking into drug use among city employees" and had asked plaintiff in January 1984 whether he obtained cocaine from former city employee Karen Johnson. Citing "law-enforcement officials familiar with" the grand jury testimony of plaintiff, the article continues that plaintiff denied that he had obtained cocaine from Johnson, and further denied that he was a "cocaine user." Also, "according to several officials," the grand jury heard testimony contradicting plaintiff's statements, and was then "examining whether he committed perjury."[3]

First, the Government's evidentiary submission reveals that portions of this report are not accurate. For example, the focus of the grand jury's inquiries was cocaine distribution by Karen Johnson, not "drug use among city employees;" the next step taken by the grand jury would have been to investigate Johnson's suppliers. Declaration of Robert R. Chapman (hereinafter "Chapman Decl.") at 33. In addition, without disclosing secret information here, it can be said that the substance of plaintiff's

---

3. The 1984 New York Times article makes several other references to "law-enforcement officials" in other contexts. These references relate to discussions of police investigations, *see, e.g.,* paragraph 3, and other non-grand jury information. *See* paragraph 7 (conjecture of "law-enforcement official" regarding difficulty in proving possession of narcotics after the fact). As these references do not implicate Rule 6(e), *see infra* note 7 and accompanying text, they will not be discussed further.

testimony was not as this article reported it. *Id.* at 34. Finally, the grand jury at that time had not yet turned to any investigation of plaintiff's alleged perjury. *Id.* These errors substantially weaken the *prima facie* inference of unlawful disclosure by Government officials. While the Court might take a reporter's statement of reliance on Government sources as true in assessing the *prima facie* case, it need not do so now. These inaccuracies seriously undermine the credibility of the reporter, or indirectly, that of his source.

Second, the Government's submission shows that much of the information disclosed had been made public previously. On August 11, 1984, plaintiff's counsel stated in a newspaper interview that, had Karen Johnson testified, she would have "substantiate[d] Barry's statement to federal authorities that he did not obtain cocaine from her." *See Barry–Johnson Relationship Described,* Washington Post, Aug. 11, 1984, at A1, col. 2. Earlier articles had reported with attribution only to "informed sources" that the grand jury asked whether he had obtained cocaine from Johnson, *see City Employe Indicted on Cocaine–Selling Charges,* Washington Post, Apr. 19, 1984, at A1, col. 2, and that plaintiff denied doing so. *See D.C. Employe Sentenced, Subpoenaed,* Washington Post, July 24, 1984, at A1, col. 5.

The information before the grand jury in supposed contradiction to plaintiff's testimony had been disclosed in part during the sentencing of Karen Johnson, *see* Gov't Sentencing Memo. at 4, Def.App. at 32, and widely reported thereafter with attribution only to vague sources. *See D.C. Employe Sentenced, Subpoenaed,* Washington Post, July 24, 1984, at A1, col. 5 (reporting that tape recorded conversation detailing sales to plaintiff presented to grand jury); *Drug Figure's Story Could Implicate D.C. Offi-*

*cials,* Washington Times, Aug. 3, 1984, at 8A, col. 1 (reporting substance of Government sentencing memorandum and that identity of drug buyer "believed to be" plaintiff).

█ The Court does not note these earlier reports because they would excuse any subsequent Government disclosure. To the contrary, Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs. The Government is obligated to stand silent regardless of what is reported, accurate or not, by the press. The repetition of information which the press had widely reported earlier, however, should not create a particularly strong inference of government disclosure. By the time the New York Times article was published, a myriad of individuals were "familiar with" plaintiff's testimony. It is by no means clear that the source for this publication was in fact a person covered by Rule 6(e).

To the extent any doubt remains whether unlawful disclosure occurred, the Government's proffer of affidavits fully answers it. Special Agent William J. Hotop of the FBI conducted an investigation into the matters disclosed in this article, specifically to determine the identity of government personnel with knowledge of those matters. Declaration of William J. Hotop at 1. Reasonable inquiries revealed 135 such persons. Excluding members of the grand jury, grand jury witnesses and their attorneys, a probation officer, and two D.C. police officers, 84 federal government employees fall within the ambit of both Rule 6(e) and plaintiff's allegations.[4] *See id.* at 3–4.

The Government has proffered affidavits signed by each of these 84 persons, save two,[5] unequivocally denying any unlawful

---

4. Plaintiff complains that the Government has not attempted to account for every individual falling within Rule 6(e)'s strictures, citing for example "clerical personnel, court reporters, grand jury members, support personnel," etc. The Government recognized that it had to address clerical personnel. As for the others plaintiff claims are included within this litigation, he is mistaken. Plaintiff brought suit

against the executive branch of the federal government, and only individual's therein are obligated to respond to his claims.

5. The Government could not locate one Drug Enforcement Administration Agent. In addition, a former Assistant Attorney General for the Criminal Division, now a federal judge, stated by telephone interview that he had not dis-

disclosure. The Court of Appeals held that two such affidavits would not suffice to negate the inference of a Rule 6(e) violation, but left open the possibility that more might do so. *See Barry*, 865 F.2d at 1325 n. 9. The Government now offers denials from more than a few of the officials with grand jury·access. With two exceptions, *every* Assistant United States Attorney, Department of Justice official, Drug Enforcement official and FBI Agent, in addition to.support staff from each agency, has denied that he or she was the source of the leaks alleged by plaintiff. With only the words of the New York Times article to counter them,[6] these affidavits effectively negate any inference of unlawful disclosure.

### B. The Washington Post and Times Articles of August 10, 1984

The Court of Appeals singled these articles out because the first "mentions certain grand jury testimony relating to an investigation of alleged D.C. Government corruption and also·cites the comments of an allegedly 'knowledgeable law enforcement official' about that testimony," and because the second reported comments allegedly made by an Assistant United States Attorney indicating that a narcotics investigation would be "continuing." *See id.* at 1325.

.The Post article contains only one paragraph disclosing grand jury information. The article states that plaintiff, "in an interview with federal prosecutors and in testimony to the grand jury in January, said he had a close personal relationship with

Johnson but flatly denied buying or receiving cocaine from her, sources said." *Ex–City Worker is Jailed After Refusing to Testify*, Washington Post, Aug. 10, 1984, at A1, col. 4. Again, the Court notes that this information had been published earlier, also with the vague and unqualified reference to "sources." *See D.C. Employe Sentenced and Subpoenaed*, Washington Post, July 24, 1984, at A1, col. 5. The inference of Government disclosure is a fragile one at best and has effectively been negated by the Government's affidavits.

The *Post* article also discusses the grand jury appearance and subsequent jailing of Karen Johnson. This information does not fall within Rule 6(e), since the contempt order was read in open court. Nor does the discussion of the tape recording obtained by police investigation implicate Rule 6(e).[7] The article cites a "knowledgeable law enforcement" source for the unremarkable proposition that grand jury witnesses facing contempt rarely decline to testify. That this self-evident statement came from some member of the executive branch does not buttress claims that true grand jury disclosures elsewhere in the article also have the Government as their source. *See Lance*, 610 F.2d at 218.

The Washington Times article reports that "Assistant U.S. Attorney Robert R. Chapman said that despite Johnson's refusal to cooperate the grand jury will continue its narcotics investigation." *Karen Johnson Jailed for Contempt Loses Job*, Washington Times, Aug. 10, 1984, at 1A, col. 3.

closed any grand jury information but declined *to involve himself formally in this matter.*

**6.** Plaintiff also submits the following excerpt from a newspaper interview with then-FBI Director William Webster to support his pattern or practice allegation: "What we do is to start an unraveling process, and people want to protect their backsides by cooperating with us, and that takes us to more and more people." *Patience, Persistence Key to District Probe*, Washington Post, May 31, 1987, at A1, col. 4. Plaintiff views this statement, in combination with deposition testimony. by a reporter about the Government "shaking the trees," as proof positive of a Government policy to leak grand jury information. The Court cannot agree. Not only are Director Webster's remarks unrelated to this

case, they do not necessarily relate to the grand jury, as opposed to other investigatory information and practices. The latter point also applies to the deposition testimony, which was made by an individual outside the Government in any event. *These statements are no help to plaintiff's case.*

**7.** Of course, disclosure of information derived from a source outside the grand jury process, "such as a prior government investigation," is no violation of Rule 6(e). *Lance*, 610 F.2d at 217 (citing *In re Special April 1977 Grand Jury*, 587 F.2d 889, 892 (7th Cir.1978); *United States v. Archer*, 355 F.Supp. 981, 989 (S.D.N.Y.1972), *rev'd on other grounds*, 486 F.2d 670 (2d Cir. 1973)).

The bulk of the article recounts events surrounding Johnson's contempt of Court. It also states that "[n]either prosecutors nor [Johnson's attorney] would disclose what questions Johnson refused to answer" and that "[t]he U.S. Attorney's Office has refused to define the scope of its investigation...." *Id.* Nonetheless, "one source said that the Johnson indictment likely will lead to 'indictments farther up the ladder.'" *Id.*

Chapman himself denies making the statement attributed to him as it is reported. He concedes only that he said something to the effect that "it is continuing." *See* Chapman Decl. at 28. By itself, such a statement cannot be said to reveal the content or direction of the grand jury's work. The statement by an unspecified source is speculative, and not entirely accurate, since the investigation would pursue individual's higher up the narcotics distribution ladder, not the ladder of Government as one might infer. This, in combination with the Government's affidavits, effectively rebut plaintiff's allegations.

### C. The Remaining News Reports

#### 1. *1984 News Reports*

No other 1984 news report creates a greater inference of unlawful disclosure than the August 1984 New York Times article. Most of the passages cited by plaintiff do not reveal information covered by Rule 6;[8] where such information is revealed, the reports typically cite "sources," "informed sources" or "sources familiar with the case."[9] Some passages are simply wrong.[10] Only one article, *Further Indictments Seen in City Drug Case,* Washington Times, Apr. 20, 1984, at 8A, col. 5, cites a "law enforcement official" for the statement that the indictment of Johnson could lead to indictments "higher 'up the ladder'—in the distribution of cocaine." As noted above, the statement is speculative, and to the extent this statement implies that high city Government officials had become targets, it is incorrect. To the extent this or other articles accurately reveal grand jury information and implicate a Government source, the Government affidavits effectively rebut any inference of a Rule 6(e) violation.

#### 2. *1986–1987 News Reports*

The vast majority of reports offered by plaintiff during this period do not reveal grand jury material at all. The several references to police investigations among these articles cannot be remedied under

---

8. *See City Employe Indicted on Cocaine–Selling Charges,* Washington Post, Apr. 19, 1984, at A1, col. 2 (citing allegations of Franklin Law as impetus behind police investigation); *Ruiz Quits D.C. Cable Post,* Washington Times, Apr. 19, 1984, at 1A, col. 4 (discussing indictment following investigation by Drug Enforcement Administration); *Further Indictments Seen in City Drug Case,* Washington Times, Apr. 20, 1984, at 8A, col. 5 (discussing Drug Enforcement Administration investigation); *City Worker Pleads Guilty to Cocaine Sale, Possession,* Washington Post, June 19, 1984, at B1, col. 1 (discussing Law's allegations, and taped conversation between Law and Johnson); *City Worker Gets 4–Month Sentence,* Washington Times, July 24, 1984, at 9A, col. 3 (reporting that Johnson case, according to prosecutors, was part of "active on-going investigation involving drugs" in District); *Barry–Johnson Relationship Described,* Washington Post, Aug. 11, 1984, at A1, col. 2 (disclosing result of investigation of Johnson's phone records, allegations of Law and tape recorded conversation between Law and Johnson). Again, information derived from police investigations is not subject to Rule 6 secrecy. *See supra* note 7.

9. It is appropriate to note that although the Court of Appeals offered the possibility that precise attribution in one article might reveal the identity of unnamed sources elsewhere, this record does not support such a deduction. For example, the August 1984 New York Times article contained the most precise attribution—to law enforcement officials. It came well after public disclosure of the same information by plaintiff's counsel. Given the nature of the information, any disclosure with attribution to mere "sources" also reporting that information might just as easily have come from plaintiff or his associates.

10. *See D.C. Officials Say Jailed Employee Still on Payroll,* Washington Times, Aug. 8, 1984, at 9A, col. 5 (reporting speculation that Johnson was paid for silence "when she returns to the federal grand jury today"). Johnson was to make no appearance that day. *See* Chapman Decl. at 25. A second article makes the identical error. *See Drug Figure's Story Could Implicate D.C. Officials,* Washington Times, Aug. 3, 1984, at 8A, col. 1.

Rule 6(e).[11] A number of articles rely on detailed, publicly filed search warrant returns and inventories.[12] Also, the grand jury issued a rather detailed subpoena to the custodian of plaintiff's official records. Compliance with this subpoena was publicly observed, and the report thereof refers merely to "sources" and "sources familiar with the inquiry." [13] While one other article arguably reveals other grand jury information, the article also cites only "sources." [14] Finally, reports of one witness' appearance before the grand jury, Jared Kinnon,[15] twice include references to his discussions with prosecutors.[16] The appearance itself was publicly observable. Kinnon's discussions with prosecutors outside the grand jury do not fall within Rule 6(e).

In sum, detailed scrutiny of these news reports indicates that the Government had no role in the disclosure of any grand jury information during 1986 and 1987. Actual grand jury disclosures are few. In those cases where disclosure occurred, there are no precise governmental attributions upon which any inference could be made that similar unattributed revelations resulted from the same governmental source. In no sense do these reports support a finding of a pattern or practice of governmental disclosure.

### III. *Conclusion*

The Government has met its burden by negating the inference of unlawful disclosure created by the news reports proferred by plaintiff. In each instance, the report did not reveal grand jury information, proved false, was attributable to vague sources, or was answered adequately by the Government's affidavits. The complete record before the Court does not in any way support a finding of Rule 6(e) violation. Judgment in this matter will therefore be entered for defendants.

---

**11.** *See, e.g., FBI Probes D.C. Contracting,* Washington Post, May 23, 1987, at A1, col. 4 (reporting investigatory techniques used to probe city government business); *FBI 'Consulting Firm' Formed for D.C. 'Sting',* Washington Post, May 24, 1987, at A1, col. 4 (reporting FBI sting operation using company with agent as partner); *Contractor Says Cash Was Asked,* Washington Post, May 26, 1987, at A1, col. 1 (same, including investigators' belief as to role of city official in awarding contract to false company).

**12.** *See, e.g., U.S. Probes Gifts to Barry Aide,* Washington Post, May 27, 1987, at A1, col. 6; *Corruption Inquiry Broadens,* Washington Post, May 28, 1987, at A1, col. 2; *Items Linking Barry, Drug Seller Seized,* Washington Post, May 28, 1987, at A8, col. 1; *Johnson Records Might Show Her Silence Was Bought,* Washington Times, May 28, 1987, at A1, col. 1; *Probers Told Poker Raised Hush Money,* Washington Times, June 24, 1987, at A1, col. 1.

**13.** *See Barry's Expenses Probed,* Washington Post, Aug. 21, 1986, at A1, col. 1.

**14.** *See FBI 'Consulting Firm' Formed for D.C. 'Sting',* Washington Post, May 24, 1987, at A1, col. 1 (reporting that former city administrator had appeared before grand jury "in part to answer questions about the mayor's office accounts, sources said").

**15.** *See* Transcript of WUSA–TV 6:00 p.m. Report, June 19, 1987 (Mark Feldstein, reporter); *Barry's Suit Calls DiGenova's Hand in High-Stakes Game,* Washington Times, June 22, 1987, at A1, col. 1; *Johnson Tells U.S. of $20,000 Cash,* Washington Post, June 23, 1987, at A1, col. 5; Transcript of WUSA–TV 6:00 p.m. Report, June 23, 1987 (Mark Feldstein, reporter).

**16.** *See Johnson Tells U.S. of $20,000 Cash,* Washington Post, June 23, 1987, at A1, col. 5; Transcript of WUSA–TV 6:00 p.m. Report, June 23, 1987 (Mark Feldstein, reporter).