**PENGUIN BOOKS USA INC. and Jeffrey R. Toobin, Plaintiffs,**

v.

**Lawrence E. WALSH, Independent Counsel, and Office of Independent Counsel, Defendants.**

**No. 90 Civ. 7636 (JFK).**

United States District Court, S.D. New York.

Jan. 31, 1991.

Frankfurt, Garbus, Klein & Selz, New
York City (Martin Garbus, Maura J. Wog-

an, of counsel), for plaintiff, Penguin Books USA Inc.

Cravath, Swaine & Moore, New York City (David Boies, Robert H. Baron, of counsel), Howard, Darby & Levin, New York City (Aaron R. Marcu, of counsel), for plaintiff, Jeffrey R. Toobin.

Guy Miller Struve, New York City (Bryan Blaney, Michael D. Vhay, of counsel), for defendants.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

KEENAN, District Judge:

This action was instituted by plaintiffs Penguin Books USA Inc. ("Penguin") and Jeffrey R. Toobin ("Toobin"), seeking certain equitable relief concerning the proposed publication of a book entitled *Opening Arguments: A Young Lawyer's First Case—United States v. Oliver North* ("*Opening Arguments*"). *Opening Arguments*, authored by Toobin, is scheduled to be published by Penguin. The book is based on Toobin's experiences as an Associate Counsel with defendant Office of Independent Counsel ("OIC") in connection with his work on the investigation into, and prosecutions relating to, the Iran–Contra affair. Defendant Lawrence E. Walsh ("Walsh" or "Judge Walsh") is named in his capacity as Independent Counsel.

In Count I of the Complaint plaintiffs seek a permanent injunction barring defendants "from taking any further action to prevent, delay, hinder or otherwise interfere with" plaintiffs' "exercise of their First Amendment rights to publish *Opening Arguments*." (Complaint ¶ 37). Count II of the Complaint seeks a declaratory judgment that publication of *Opening Arguments* would not subject either Penguin or Toobin to liability for violation of Rule 6(e) of the Federal Rules of Criminal Procedure. (Complaint ¶ 40). Count III of the Complaint seeks a declaratory judgment that publication of *Opening Arguments* will not violate any contractual or fiduciary duty owed by Toobin to defendants and will not give rise to a cause of action against

Toobin for a constructive trust on his revenues from publication. (Complaint ¶ 46).

Defendants' Answer asserts four "affirmative defenses" to the Complaint. (Answer ¶¶ 47–50). The first defense is that the Complaint fails to state a claim upon which relief can be granted. (Answer ¶ 47). The second defense is improper venue. (Answer ¶ 48). The third defense is that the District of Columbia District Court has jurisdiction over Rule 6(e) issues presented by Count II of the Complaint. (Answer ¶ 49). This third defense was rejected by this Court's Order of December 26, 1990. Defendants' fourth defense is that

> "The relief demanded by plaintiffs is barred by plaintiffs' inequitable conduct, including laches, unclean hands, and prior dissemination of Toobin's manuscript without seeking any judicial declaration as to their legal right to do so, as well as Toobin's retention of materials containing confidential information relating to the work of the OIC when he left the OIC." (Answer ¶ 50).

Additionally, defendants assert two counterclaims: First, that "defendants are entitled to a declaration that certain portions of Toobin's manuscript are covered by Rule 6(e)" (Answer ¶ 52); and second, that they "are entitled to a declaration that under Disciplinary Rule 4–101 of the Code of Professional Responsibility, 5 C.F.R. § 735.206, 28 C.F.R. § 45.735–12(b) and (c), and Toobin's contractual and fiduciary duties to the OIC, Toobin does not have a legal right to disseminate non-public information relating to the work of the OIC without the consent of the OIC." (Answer ¶ 54).

Jurisdiction is proper in this Court, the Court having subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1331. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

### Findings of Fact

A trial was held before the Court on January 3, 1991. Many of the facts were stipulated to by the parties. The only witness at trial was plaintiff Toobin, who was

employed as an Associate Counsel at the OIC from January 31, 1987 to May 4, 1989. (Stip. ¶¶ 8, 9 *). Toobin presently is employed as an Assistant United States Attorney in the Eastern District of New York.

During his employment at the OIC, Toobin collected thousands of pages of materials relating to the work of the OIC which he retained when he left the employ of the OIC. (Stip. ¶ 19). Among other things, Toobin collected and took with him 22 spiral-bound notebooks comprising approximately 2,176 pages. These contained notes taken during internal OIC meetings, records of internal OIC discussions, and other matters relating to the work of the OIC. (Stip. ¶¶ 20, 21). In addition to these notebooks, Toobin took with him some 64 pages of handwritten notes relating to the work of the OIC (see Stip. ¶ 23). Included in the notebooks and notes were textual materials typed by Toobin on OIC word processors. (Stip. ¶ 25). Toobin also took with him thousands of pages of other documents, including notes written by Independent Counsel Walsh; documents dealing with possible criminal charges; and documents revealing investigation results and plans. (Stip. ¶¶ 26–29). He made use of these materials in writing *Opening Arguments*.

During his employment with the OIC, Toobin signed certain non-disclosure agreements. On March 10, 1987, he signed a "CIA Addendum to Nondisclosure Agreements," pursuant to which he agreed to "submit to CIA for security review all materials, including works of fiction, that contain any mention of CIA intelligence data, activities, or subjects to which [he is] given access, that [he] contemplate[s] disclosing publicly or that [he has] prepared for public disclosure...." (Stip. Exh. 2). The purpose of the CIA review was to "give the CIA an opportunity to determine whether the information or materials [he] contemplate[s] disclosing publicly contain any classified or classifiable information." (*Id.*). On March 11, 1987, Toobin signed a "Classified Information Nondisclosure Agree-

ment (Industrial/Commercial/Non–Government)" pursuant to which he "acknowledge[d] that [he had] received a security indoctrination concerning the nature and protection of classified information, including the procedures to be followed in ascertaining whether other persons to whom [he] contemplate[s] disclosing this information have been approved for access to it, and that [he] understand[s] these procedures." (Stip. Exh. 3 at ¶ 4). Also on March 11, 1987, Toobin signed a "Sensitive Compartmented Information Nondisclosure Agreement" pursuant to which he agreed "to submit for security review by the Department or Agency that last authorized [his] access to such information" any information related to or derived from Sensitive Compartmented Information which he intended to disclose. (Stip. Exh. 4 at ¶ 4). On May 4, 1989, the day Toobin left the employ of the OIC, he signed three additional agreements. The first is a "Non–Disclosure Agreement" which states as follows:

The OIC requires each individual granted access to the following categories of material to enter into a nondisclosure agreement:

Investigative material compiled by this office which relates directly/indirectly to this investigation and its sources, both U.S. and foreign.

Grand Jury material. Rule 6(e) of the Federal Rules of Criminal Procedure— An obligation of Secrecy for material provided to the Grand Jury concerning this investigation, to include exhibits, whether on tape, paper, or original form.

Central Intelligence classified material—Materials containing mention of CIA intelligence data, activities, or subjects. [Will be submitted for review prior to release. Written approval from the CIA is required for its release.]

National Security Information—That information referred to as Sensitive

---

* "Stip." citations are to paragraphs of the stipulation of facts submitted by the parties pursuant to the Court's Order of December 12, 1990.

Compartmented Information (SCI), Codeword, Special Access Programs (SAPS), and Top Secret, Secret, and Confidential Collateral information that is classifiable under Executive Order or statute for which proper indoctrination has been granted by a U.S. Government agency, with the authority to do so, for access to material which pertains to this investigation.

Individuals granted access to any information in the above defined categories are not authorized to discuss, provide, or in any manner divulge said information to anyone outside this office without the written approval of the Independent Counsel or his duly designated representative. . . .

(Stip. Exh. 5). He again signed the "Sensitive Compartmented Information Nondisclosure Agreement," in acknowledgement that he had undergone a security debriefing. (Stip. Exh. 6). Finally, Toobin signed a "Termination of Access to Certain Classified Information" pursuant to which he acknowledged that the termination of his access barred him "from further access to [certain classified information] and materials but does not release [him] from [his] continuing obligation to protect the security of said information and material." (Stip. Exh. 7).

Toobin testified that on May 2, 1989, he informed defendant Walsh and his associate Guy Miller Struve ("Struve") that he planned to write a book on his experiences at the OIC. (Tr. at 29 **). As Toobin recollects, Walsh said that such an endeavor could be "tricky" and indicated that he himself was thinking of writing a book on the experience. (Tr. at 30–31). Toobin testified that he acknowledged his obligation to obtain prepublication review of the book, and that if Walsh had any problems with what Toobin wrote, they could "try to work them out." (Tr. at 31). The next day, May 3, 1989, Toobin went into Walsh's office to say good-bye, and again mentioned that he wanted Walsh to "be comfortable" with the book, and stated that he was going to submit it to Walsh for his review. Again,

Toobin testified, Walsh mentioned that he, too, was planning to write a book. (Tr. at 31). Toobin further testified that he mentioned his book for a third time to Walsh at a victory party after the North verdict was delivered on May 4, 1989, and that they discussed the hope that their respective books would enjoy successful sales. (Tr. at 33–34).

It is undisputed that on May 16, 1989, Toobin submitted to Walsh a portion of the manuscript for his proposed book, which was submitted simultaneously for OIC clearance to Al Stansbury ("Stansbury"), Director of Security for OIC. Toobin stated in an accompanying letter addressed to Walsh that he had shown the manuscript to "no one except my wife." He indicated that Walsh had "concerns about the idea of [Toobin's] writing a book," but assured Walsh that he wanted to try to write the book and "to do it right." Toobin stated, "Let me be very clear about the single use I plan to make of the enclosed section at this time. Most importantly, I do *not* want to publish it or in any way publicly disseminate it. My sole purpose in submitting this section for review is to allow me to show it to a small group of publishers." (Stip. Exh. 8) (emphasis in original).

Toobin's initial submission of a portion of his manuscript was replied to by Struve, on behalf of the OIC, on May 25, 1989. In a letter to Toobin, Struve stated,

"[W]e have reached certain general conclusions which Judge Walsh has asked that I transmit to you without delay. . . . At numerous points, your draft manuscript refers to matters which were and are totally internal to the [OIC], including discussions at staff meetings, discussions outside of staff meetings, and internal memoranda. We believe that it is improper for you to disclose such matters outside the [OIC], and we object to any such disclosure. Your draft manuscript also refers to certain matters which transpired between our Office and others which relate to the business of the Office and which have not been the subject of public disclosure. We believe that

** "Tr." citations are to the transcript of the January 4, 1991 trial.

it is improper for you to disclose such matters outside the Office, and we object to any such disclosure."

(Stip. Exh. 9). Toobin replied directly to Walsh in a letter dated May 31, 1989. Toobin expressed surprise at the position taken by the OIC and stated,

"As I understand the obligations of former prosecutors, there is no law or privilege that bars discussion of all 'internal' office business. Nor does the fact that certain matters 'have not been the subject of public disclosure' create a ban on my writing about them. Indeed, there is a substantial body of writings by members of prosecution teams about their experiences. To cite just two examples from Watergate, there is 'Stonewall,' by Richard Ben–Veniste and George Frampton, who were Assistant Special Prosecutors, and 'Not Above the Law,' by James Doyle, who was press officer to the Special Prosecutor. My manuscript deals with the same kinds of matters as these books."

(Stip. Exh. 10). Toobin stated that he wanted to "accommodate" Walsh, and that he hoped to handle on his own the clearance for the manuscript. He indicated, however, that due to the tone of Struve's May 25, 1989 letter, he might need to obtain counsel.

On July 18, 1989, Toobin wrote to Michael R. Bromwich, Esq., of the OIC, to obtain from the OIC written authorization to submit the then 72–page manuscript to an agent. Toobin wrote,

"Based on our meeting in Oklahoma City yesterday, my understanding is that the OIC is willing to provide such written authorization for the 72–page manuscript which I previously furnished—minus the reference to a certain White House official. Based on my conversation with you, Judge Walsh and Jim Wieghart yesterday, I am authorized to provide this material to Esther Newberg of ICM. The OIC will subsequently provide the written authorization."

(Stip. Exh. 11). Bromwich signed the July 18, 1989 letter on behalf of the OIC, thereby authorizing the manuscript's submission to Esther Newberg.

On September 8, 1989, October 12, 1989, October 23, 1989, November 2, 1989 and November 21, 1989, Toobin supplied Stansbury with additional portions of his manuscript for OIC clearance. (Stip. Exhs. 12, 14, 15, 18, 23).

In a letter to Struve dated October 27, 1989, Toobin acknowledged having received an October 11, 1989 letter from Struve. He also acknowledged having "excised from the manuscript all the classified information identified by Al Stansbury." (Stip. Exh. 16). Toobin stated, however, that he was "concerned by the comments about Rule 6(e)" of the Federal Rules of Criminal Procedure, and noted that Struve had found alleged Rule 6(e) violations in the manuscript. Toobin stated that he had reviewed the manuscript, and requested that Struve "identify specifically how and where [Struve] believe[s] that [Toobin] may have transgressed Rule 6(e), so that [he] may take appropriate action." *Id.*

In a letter to Struve dated November 13, 1989, Toobin acknowledged receipt of a letter from Struve dated November 1, 1989. Toobin stated that he had read the cases cited by Struve and "reconsidered [his] previous request that [Struve] identify specific instances in [the] manuscript" that Struve felt violated Rule 6(e). Toobin stated, "I take my Rule 6(e) obligation seriously, and I have now re-examined the manuscript in light of your letter and taken appropriate action. After that additional review, I turned over copies of the chapters to my editor." *Id.*

On that same day, November 13, 1989, Struve wrote to Toobin, enclosing pages from Chapters 8 and 9 of the manuscript, which Stansbury had identified as "presenting security problems, with the material that creates the problems redacted." (Stip. Exh. 20). Struve stated,

"As you know, your manuscript has been reviewed exclusively for classified information by Mr. Stansbury, based on your representation that you will disclose the manuscript only to your editor. Prior to your publishing any portion of the manu-

script, the entire manuscript will have to be submitted to the Central Intelligence Agency, as well as to any other affected agency for purposes of a classified information review."

*Id.* In addition, Struve stated that Chapters 8 and 9 contain Rule 6(e) material "as well as office confidences the disclosure of which is not consistent with the spirit of the Oklahoma City agreements. We trust that you will redact such materials before disclosing the drafts of chapters 8 and 9 to anyone, including your editor." *Id.* A virtually identical version of this letter again was submitted to Toobin on November 22, 1989 (Stip. Exh. 24) and again on December 1, 1989. (Stip. Exh. 26). The November 22, 1989 letter, however, stated that Chapter 10 was found to contain no classified information, and the December 1, 1989 letter indicated that Chapter 11 contained no classified information. (Stip. Exhs. 24 & 26).

On November 15, 1989, Toobin wrote to Struve in response to Struve's letter of November 13, 1989, concerning Chapters 8 and 9. Toobin stated, "After removing the words identified as classified and making sure that the manuscript conforms both with Rule 6(e) of the Federal Rules of Criminal Procedure and the spirit of the discussions in Oklahoma City, I have passed the chapters to my editor and agent." (Stip. Exh. 21). Struve responded on November 15, 1989, requesting that Toobin submit copies of the chapters that were turned over to his editor for OIC review. (Stip. Exh. 22). And on November 22, 1989, Struve wrote to Toobin, noting that the OIC had not been advised that Toobin proposed to submit Chapters 8 and 9 to his editor and that the OIC had not authorized this submission. Struve stated, "We ask that you notify us fully, in advance, of any disclosure you propose to make of any portions of your manuscript to anyone other than your editor." (Stip. Exh. 25).

From December 1, 1989 through January 10, 1990, Toobin and Struve exchanged numerous letters. Struve repeatedly asked that Toobin submit to the OIC a copy of the manuscript in the form in which it had been given to his editor, and Toobin repeatedly

stated that he hoped to have a final manuscript to submit to the OIC in the near future. (Stip. Exhs. 27–34).

On March 3, 1990, Toobin wrote directly to Walsh and enclosed for OIC final review a copy of his completed manuscript. Toobin stated in this letter as follows:

I am very pleased that, once we got the formal review process on track, we were able to reach a mutually satisfactory conclusion without unduly distracting you from your more important duties. Should you have the time to read the manuscript, I would be honored to hear your thoughts.

I am also pleased to report that the CIA has finished its review of the manuscript and cleared it for publication in its entirety. In a few particulars, the CIA disagreed with the OIC's determination of what was classified. Notwithstanding the CIA's approval, in most of those instances, I chose to redact passages which the OIC had marked as classified. I hope that you will see this as the courtesy to you which I intended it to be. With respect to parts of Chapter 5, however, I have elected to adopt the CIA's determination of what was classified. I trust that you will agree that when the subject is the CIA itself, the CIA's views should control....

(Stip. Exh. 35). Walsh replied on March 6, 1990, expressing his displeasure at Toobin's distribution of the manuscript to his editor, the CIA, "and perhaps others," without having resolved the "6(e) questions before Chief Judge Robinson" of the District of Columbia Federal District Court, who has supervised the OIC grand juries. Walsh stated, "As you know I have not consented to the release of any privileged material: attorney-client privilege or work product. Further, a hasty scanning of the book discloses large amounts of 6(e) material." Walsh advised Toobin that "[f]inal classification review requires further action and referral by this Office which cannot be undertaken until the 6(e) material and privileged communications have been removed." As a final warning, Walsh stated, "I urge

you not to make matters worse by further disclosure." (Stip. Exh. 36).

By March 19, 1990, Toobin had obtained an attorney to represent his interests in attempting to obtain OIC clearance for his manuscript. In a letter dated March 20, 1990, Struve wrote to Toobin's lawyer, Aaron Marcu, acknowledging that Toobin had agreed

"not to publish the book he has written concerning the work of [the OIC] before the fall of 1990, but is unwilling to make or reaffirm the additional commitments which Judge Walsh understood Mr. Toobin to have made at the July 1989 meeting in Oklahoma City (1) that the work will not be published before the determination of the North appeals, including any remand resulting therefore, and (2) that the work will not be published before the issuance of the final report of this office."

(Stip. Exh. 37). On March 26, 1990, Marcu responded to Struve's letter, denying that Toobin ever made any agreement with Walsh not to publish the book until the determination of the North appeals or until the issuance of the OIC's final report. (Stip. Exh. 38). On April 2, 1990, Struve wrote, "Whatever Mr. Toobin's recollection of the Oklahoma City meeting, it is obvious that the only person who can release the privileged and nonpublic information which Mr. Toobin has included in the manuscript is Judge Walsh. Judge Walsh has never agreed to release this information." (Stip. Exh. 39). Struve ended his letter with the following: "In light of your failure, in your March 26, 1990 letter, to confirm that the published book will not contain any of the extensive privileged and nonpublic information in Mr. Toobin's present manuscript, we have no choice but to take those steps which, in our judgment, are necessary to deal with an unauthorized and unlawful release of this information." (Stip. Exh. 39).

On April 12, 1990, Walsh advised the Department of Justice that it should take "all appropriate legal and administrative steps with respect to the dissemination and threatened publication by Jeffrey R. Toobin, Esq. . . . of a book concerning the work of the [OIC]." (Stip. Exh. 40). Toobin was informed of this referral through a letter from Struve to Marcu dated April 18, 1990. (Stip. Exh. 41). On May 16, 1990, Toobin made a personal plea to Walsh to meet with him about his book, in an effort to resolve the dispute over the book's publication. (Stip. Exh. 42). Walsh responded on May 22, 1990, stating that Toobin's communication with him should be through counsel. (Stip. Exh. 43).

On July 9, 1990, Mary C. Lawton, Counsel for Intelligence Policy of the U.S. Department of Justice, wrote to Bryan Blaney, an Associate Counsel at the OIC, that she had reviewed the Toobin manuscript for classified information. Ms. Lawton found "only one instance of classified information." (Stip. Exh. 45). Struve forwarded this information to Marcu, and stated in a letter dated July 13, 1990,

"It must be emphasized that this classification review did not encompass the portions of the manuscript containing non-public information concerning the work of this Office. As you know, this Office has not approved the dissemination of any such information in the manuscript, and therefore has not transmitted any such information for classification review. Therefore, the final classification review as to that information has not been completed.

As I have already stated in my letters of April 2, 1990 and June 1, 1990, and as we have discussed on a number of occasions, it is the position of this Office that any disclosure by your client of nonpublic information concerning the work of this Office is unauthorized and unlawful."

(Stip. Exh. 47). *See also* (Stip. Exh. 53).

On October 11, 1990, Struve drafted a proposed letter to Hal Lieberman, Esq., Chief Counsel, Departmental Disciplinary Committee, Supreme Court of the State of New York, Appellate Division, First Department, concerning Toobin, a member of the New York bar. Struve gave a brief description of Toobin's background and proposed manuscript. He then stated that the OIC believed that Toobin's dissemina-

tion and threatened publication of his book constituted violations of his responsibilities under DR 4–101, entitled "Preservation of Confidences and Secrets of a Client." (Defs.' Mem. at 14 n. *, 16 n. *; Tr. at 83–84). Although this letter was never sent to the Disciplinary Committee, Struve did submit it to the Department of Justice. Toobin became aware of this proposed letter when he received it on or about October 11, 1990 from his employer, Andrew J. Maloney, the United States Attorney for the Eastern District of New York. (Toobin Aff. ¶ 6).

On November 27, 1990, counsel for Penguin advised Struve that due to the fact that Toobin's attempt to obtain prepublication clearance of his book had been unsuccessful, Penguin had terminated its agreement to withhold prepublication dissemination. (Stip. Exhs. 56 & 57). This suit then was filed by plaintiffs.

Counsel for the OIC has indicated that the *North* case is still in the appellate process as is the *Poindexter* case, involving the former Director of National Security. (Tr. at 19).

### Prior Proceedings in This Action

On December 12, 1990, the parties appeared before the Court to discuss the scheduling of the action and the issue of transferring the Rule 6(e) issues to the District Court for the District of Columbia. On that same day, the Court issued a scheduling order, which directed defendants to submit under seal an annotated copy of *Opening Arguments*, indicating the materials alleged to implicate a violation of Rule 6(e) and the materials alleged to implicate a breach of Toobin's fiduciary and contractual duties to the OIC. Plaintiffs also were directed to submit under seal an annotated version of the book indicating why the portions noted by defendants are not violative of the applicable provisions. In that order, the Court also directed Toobin to produce to defendants the documents he either generated or obtained while working for the OIC and that he took with him when he left the office.

On the designated submission dates, the parties supplied the Court with their annotated copies of the manuscript, and plaintiffs provided an extensive appendix, marked to indicate the portions of the manuscript that contained public materials. The Court reviewed the submissions, and on December 26, 1990, ruled that the Rule 6(e) issues would not be stayed and declined to refer the matter to the District Court for the District of Columbia.

### Conclusions of Law

#### I. Permanent Injunction

Plaintiffs seek in Count I of the Complaint a permanent injunction barring defendants from taking further action to prevent, delay, hinder or otherwise interfere with plaintiffs' exercise of their First Amendment rights to publish *Opening Arguments*. Defendants oppose this request on three grounds. First, defendants have never threatened plaintiffs in any way. Second, the OIC referred any question of possible enforcement to the Department of Justice. Finally, an injunction would be inappropriate, because the Court has no authority to enjoin prospective government enforcement actions.

At trial, plaintiffs basically conceded that they could not seriously pursue their request for a permanent injunction. Toobin's attorney candidly stated, "I don't want to overemphasize the injunction. It's in the back of our brief for a reason, your Honor." (Tr. at 73). Counsel then went on to say, "The declaratory judgment is what we're about here." (Tr. at 74).

■ Nonetheless, the issue requires discussion. Defendants contend that they "have not in fact threatened the plaintiffs; instead, defendants have expressly refused to discuss with plaintiffs what action defendants would take if the Toobin manuscript is published." (Defs.' Brief on Merits at 15). The Court disagrees with defendants' view of their treatment of plaintiffs. A review of the correspondence between Toobin and the OIC in his attempt to obtain clearance for publication of the manuscript indicates that Toobin has been threatened, albeit subtly. The OIC, through Struve,

clearly told Toobin that his failure to cooperate and remove alleged Rule 6(e) material and alleged nonpublic information would require the OIC "to take those steps ... necessary to deal with an unauthorized and unlawful release of this information." (Stip. Exh. 39). The proposed letter drafted by Struve to the Disciplinary Committee of the Appellate Division, although never actually sent, found its way to Toobin's employer. The embarrassment to Toobin of the revelation of the letter's contents and the effect it might have had on his relationship with his employer are unascertainable. In addition, counsel for Penguin was told by Struve that "if Penguin published the manuscript, it would be Toobin's 'agent in the publication of illegal materials.' " (Wogan Aff. at ¶ 6).

The Supreme Court in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), wisely found that although the books at issue had not been "seized or banned by the State" and "no one has been prosecuted for their possession or sale, ... the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" by the defendant demonstrated that it "deliberately set out to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." 372 U.S. at 637. The Court stated that "informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." 372 U.S. at 638.

Defendants' statement that they have not "threatened" plaintiffs, but that they have actually "refused to discuss what action they would take if the Toobin manuscript is published" is more threatening for the absence of particularity. Defendants, by refusing to discuss their future actions against Toobin, chill plaintiffs' desire to publish the book. No one enjoys living under a cloud of threatened, or intimated, legal action. As the *Bantam* Court noted, although plaintiffs could have ignored the defendant's notices threatening legal action, plaintiff's compliance had not been voluntary: "People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if

they do not come around, and [plaintiff's] reaction ... was no exception to this general rule." 372 U.S. at 68, 83 S.Ct. at 638. The Court therefore finds defendants' contention that they have done nothing to threaten plaintiffs to be fallacious.

■ The Court does agree with defendants, however, that it has no authority to issue a permanent injunction against them. Struve has referred to the Department of Justice any possible enforcement proceedings against Toobin. (Struve letter to Attorney General Thornburgh, dated April 12, 1990, submitted with Defs.' Mem. in Opp. to App. for Order to Show Cause). The party to be enjoined, then, would be the Department of Justice, who has not been named as a defendant in this action. The Court also agrees with defendants that even if the OIC had retained enforcement authority, the Court is without authority to enjoin prospective government enforcement actions. *See Reporters Committee for Freedom of Press v. AT & T*, 593 F.2d 1030, 1065 (D.C.Cir.1978), *cert. denied*, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979); *Matter of Doe*, 546 F.2d 498, 501 (2d Cir.1976); *LaRouche v. Webster*, 566 F.Supp. 415, 417 (S.D.N.Y.1983).

Plaintiffs' application for a permanent injunction therefore is denied.

## II. Rule 6(e)

Plaintiffs seek in Count II of the Complaint a declaratory judgment that publication of *Opening Arguments* would not subject either Penguin or Toobin to liability for violation of Rule 6(e) of the Federal Rules of Criminal Procedure. In their First Counterclaim, defendants seek a declaration that certain portions of Toobin's manuscript are covered by Rule 6(e).

Plaintiffs contend that the manuscript contains no Rule 6(e) material. Defendants argue that plaintiffs' reading of Rule 6(e) "is much too narrow," and that controlling decisions in the Second Circuit and the District of Columbia Circuit indicate that those courts have adopted a " 'broad' definition of the scope of 6(e) which covers, among other things, information revealing 'the

strategy or direction of the investigation.' " (Defs.' Mem. on Merits at 19) (quoting *Fund for Constitutional Government v. National Archives & Records Serv.*, 656 F.2d 856, 869 (D.C.Cir.1981)). Defendants argue that one of the purposes of Rule 6(e) is the protection of cooperating witnesses, and the avoidance of public disclosure of charges against individuals who have been investigated but not charged. Finally, defendants take issue with plaintiffs' contention that all materials marked as Rule 6(e) information by defendants previously have been publicly disclosed. Defendants submit that although much of the information has been publicly disclosed, plaintiffs have included facts which disclose "the scope and direction of the investigation which are not public information." (Defs.' Mem. on Merits at 22).

■ Rule 6 provides in pertinent part as follows:

**(e) Recording and Disclosure of Proceedings**

**(2) General Rule of Secrecy** A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes for the government, an attorney for the government, or any person to whom disclosure is made [of grand jury information] shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

The D.C. Circuit in *National Archives, supra,* stated that "[t]he legislative history and cases construing [Rule 6(e) ] indicate that it was intended to preserve the traditional rule of grand jury secrecy with certain limited exceptions." 656 F.2d at 868 (citations omitted). The *National Archives* court reiterated the general purpose of Rule 6(e) as enunciated by the Supreme Court in *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979):

"First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as inducements. There also would be a risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule."

656 F.2d at 869. The *National Archives* court went on to state, "In order to effectuate these objectives, the scope of the secrecy is necessarily broad. It encompasses not only the direct revelation of grand jury transcripts but also the disclosure of information which would reveal the 'identities of witnesses or jurors, the substance of testimony, *the strategy or direction of the investigation*, the deliberations or questions of the jurors, and the like.' " 656 F.2d at 869 (quoting *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C.Cir.) (en banc), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)) (emphasis added). The Court finds that defendants misinterpret these holdings in one specific and significant respect. The requirement that information revealing the strategy or direction of the investigation be kept secret refers to the investigation by the *grand jury*. Defendants' interpretation would have the Court conclude that any information revealing the strategy or direction of the investigation by the *prosecution* be kept secret pursuant to Rule 6(e). The rule does not stretch that far, and the Court knows of no case law to support such a finding. Defendants' interpretation of Rule 6(e) in that respect, therefore, is rejected.

The court in *SEC v. Dresser Indus.* stated that Rule 6(e) does not require "that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury." 628 F.2d at 1382. The court in *Senate of the Com-*

*monwealth of Puerto Rico v. United States Dept. of Justice* reiterated this position, and further stated,

"There is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers; ... the touchstone is whether disclosure would 'tend to reveal some secret aspect of the grand jury's investigation' such matters as ' "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors and the like." ' The disclosure of information 'coincidentally before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury' is not prohibited."

823 F.2d 574 582 (D.C.Cir.1987) (quoting *National Archives*, 656 F.2d at 870).

██ Plaintiffs argue that defendants' interpretation of Rule 6(e) proposes "a vast and unprecedented expansion of the scope of material that is covered by Rule 6(e)." (Pls.' Brief on Merits at 14). Plaintiffs submit that Rule 6(e) does not prohibit publication of a book that discusses facts disclosed in public materials "simply because a grand jury considered the same facts where, as here, that book in no way reveals whether the grand jury did so." (*Id.* at 19). Plaintiffs contend that *Opening Arguments* contains no description of any grand jury testimony that has not already been publicly disclosed in reported judicial decisions or public judicial or congressional proceedings. (*Id.* at 20). Absent the publication of a "link" which connects the information to the grand jury, plaintiffs argue, "that information is 'not cloaked with secrecy merely because [it is] presented to a grand jury.' " (*Id.* at 23) (quoting *United States v. Lartey*, 716 F.2d 955, 964 (2d Cir.1983)). Plaintiffs further argue that " 'the government cannot immunize' that information from disclosure 'by publishing the link.' " (*Id.* at 24 (quoting *Washington Post Co. v. United States Dept. of Justice*, 863 F.2d 96, 100 (D.C.Cir. 1988)).

Defendants have indicated those portions of the Toobin manuscript which they allege reveal Rule 6(e) material. Plaintiffs have indicated next to these allegedly violative portions the public sources from which the information was derived. Plaintiffs submit that much of the information was previously publicly disclosed, and indicate the corresponding tab of Appendix B containing the public disclosure. Some of the Rule 6(e) annotations are said by plaintiffs to have derived from witness interviews, Toobin's opinion, or from investigative activities. Defendants take issue with the alleged public sources of some of plaintiffs' annotations. The Court concludes that defendants' contentions in this regard are without merit. Plaintiffs' annotations indicating information previously publicly revealed have been reviewed by the Court and the Court finds that the material is accurately cited and supportive of plaintiffs' position.

The Court has reviewed carefully the entire manuscript, and finds that the plaintiffs have not revealed any Rule 6(e) material whatsoever. Defendants' Rule 6(e) annotations often include information of such a basic, public nature that the Court is baffled by their having been marked as violative of Rule 6(e).

One particular chapter, presently Chapter 4 of the manuscript, has been labeled in its entirety by defendants as Rule 6(e) material. Pursuant to the Court's direction, defendants have submitted *ex parte* for *in camera* review the affidavit of Craig A. Gillen, an Associate Counsel for the OIC who presently is the supervisor of other Associate Counsel and is assigned to the continuing investigation of the OIC. Gillen states in his affidavit that publication of this chapter could harm the continuing investigation of the OIC because it reveals a possible OIC strategy for potential prosecution of two particular individuals.

The Court is perplexed by the OIC's stance. Most if not all of the information contained in Chapter 4 has been revealed in the reports of the Joint Hearings of the Senate Select Committee and the Senate Intelligence Committee. One particular el-

ement of Chapter 4, the title, which defendants contend is Rule 6(e) material, is a direct quote from a United States Senator during the public investigations of the Senate Intelligence Committee. The Court notes, as well, that the most substantive parts of this chapter already have been revealed in two previously published books: Senators William S. Cohen and George J. Mitchell, *Men of Zeal: A Candid Inside Story of the Iran–Contra Hearings*, and Jane Mayer and Doyle McManus, *Landslide: The Unmaking of the President 1984–1988*. The fact that defendants also include as alleged Rule 6(e) material things such as the physical descriptions of Toobin's associates and direct quotes from congressional reports indicates that defendants do indeed seek to broaden the rule beyond its present scope into new realms of secrecy. The Court declines to broaden the rule and finds that the alleged Rule 6(e) material is public information and it reveals nothing about the workings of the grand jury. Nor does Toobin's manuscript reveal "anything that may tend to reveal what transpired before" the grand jury. *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir.1991).

In addition, the Court rejects defendants' efforts to apply *Barry v. United States*, 740 F.Supp. 888, 891 (D.D.C.1990) to this action. In *Barry*, the subject of a criminal investigation alleged that Government lawyers had unlawfully disclosed grand jury secrets in some thirty-four newspaper articles. The court stated, "Rule 6(e) does not create a type of secrecy which is waived once public disclosure occurs. The Government is obligated to stand silent regardless of what is reported, accurate or not, by the press." 740 F.Supp. at 891. Unlike *Barry*, however, the sources cited by plaintiffs for the information set forth in the manuscript are not newspaper articles whose sources are unidentified. Rather, plaintiffs' sources include reports of the Senate Select Committee and the Senate Intelligence Committee. The *Barry* court's admonition to the prosecutor to "stand silent regardless of what is reported" clearly cannot be understood to be a direction to all prosecutors never to discuss cases in which they were involved. The practice in this country over the past several decades has been for prosecutors to write books about celebrated cases. Arguably, this is not a wise course for them to follow, but the wisdom of the practice is not what is at issue. Rather, it clearly indicates that there is no permanent "gag" on prosecutors from speaking or writing about investigations and prosecutions which they have conducted or in which they have been involved. *See, e.g.*, Vincent Bugliosi, *Helter Skelter: The True Story of the Manson Murders by the Prosecutor of the Tate–LaBianca Trials* (1974); Whitney North Seymour, *United States Attorney: An Inside View of "Justice" in America Under the Nixon Administration* (1975); Leon Jaworski, *The Right and the Power: The Prosecution of Watergate* (1976); Richard Ben-Veniste and George Frampton, *Stonewall: The Real Story of the Watergate Prosecution* (1977); Charles J. Hynes and Bob Drury, *Incident at Howard Beach: The Case for Murder* (1990). The Court notes as well that many books written by prosecutors about their involvement in specific cases have been written while appeals were pending or related cases were not yet tried. (Tr. at 17–18).

Plaintiffs' request for a declaration that their publication of the book will not constitute a violation of Rule 6(e) is granted. Defendants' contrary request is denied.

## III. Fiduciary and Contractual Duties

In Count III of the Complaint, Toobin seeks a declaration that publication of *Opening Arguments* will not violate any contractual or fiduciary duty owed by him to defendants and will not give rise to a cause of action for a constructive trust on his revenues from publication. (Complaint ¶ 46). In their Second Counterclaim, defendants seek a declaration that under DR 4–101 of the Code of Professional Responsibility, 5 C.F.R. § 735.206, 28 C.F.R. § 45.735–12(b) and (c), and Toobin's contractual and fiduciary duties to the OIC, Toobin does not have a legal right to disseminate nonpublic information relating to

the work of the OIC without the consent of the OIC. (Answer ¶ 54).

### A. DR 4-101

Defendants contend that Toobin, as a lawyer formerly employed by the OIC, has an obligation under DR 4-101 not to publish nonpublic information concerning the work of the OIC without the consent of the OIC.

Plaintiffs submit that DR 4-101 is not properly raised in this Court. Plaintiffs have not raised the disciplinary rules in their complaint, and they argue that a "purported violation of a disciplinary rule does not, in itself, generate a cause of action." *Brainard v. Brown*, 91 A.D.2d 287, 458 N.Y.S.2d 735 (3d Dept.1983) (citing *Cronin v. Scott*, 78 A.D.2d 745, 432 N.Y. S.2d 656 (3d Dept.1980)). The proper forum for such a complaint is said to be the Appellate Division of the Supreme Court of the State of New York, which is authorized to deal with such matters. *See* N.Y. Judiciary Law § 90 (McKinney 1983).

DR 4-101 generally becomes an issue in cases where there is a motion by a client to disqualify his attorney for an alleged breach of duty to the client, by knowingly revealing "a confidence of his client or us[ing] a confidence of his client to the disadvantage of the client." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983) (citing *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 n. 2 (2d Cir.1977); ABA Com. on Ethics and Professional Responsibility, Code of Professional Responsibility, Canon 4-101(B)). Defendants are not making such a motion in this action, but are attempting to preclude Toobin from revealing practically all information, however trivial, he absorbed while employed by defendants.

In bringing their counterclaim, defendants rely upon *United States v. Ostrer*, 597 F.2d 337 (2d Cir.1979), which applied DR 4-101 to a former prosecutor. That case reveals, defendants contend, that "a former prosecutor owes a duty to preserve the confidences and secrets of the prosecutor's office in which he served." (Defs.' Mem. at 24). The Court does not quarrel with this conclusion. *Ostrer*, however, does not remedy the fact that an alleged violation of DR 4-101 does not in itself generate a cause of action. In *Ostrer*, the Second Circuit affirmed Judge Duffy's disqualification of a former Assistant United States Attorney from representing a particular criminal defendant because the attorney's previous participation in a related criminal investigation was intricately related to his client's prosecution. The ground for disqualification was that the attorney might use the information obtained while a prosecuting attorney to aid his present client, a criminal defendant.

The Court agrees with plaintiffs and finds that the issue of DR 4-101 is not properly before it. Having reached this conclusion, the Court will not address the issue of whether Toobin violated DR 4-101. Any such determination would constitute an advisory opinion.

### B. Federal Regulations

Defendants contend that the disclosure of nonpublic information relating to the work of the OIC without the authorization of the OIC violates several federal regulations. Those regulations are cited as follows:

5 C.F.R. § 735.206:

"For the purpose of furthering a private interest, an employee shall not, except as provided in § 735.203(c) [which is inapplicable here], directly or indirectly use, or allow the use of, official information obtained through or in connection with his Government employment which has not been made available to the general public."

28 C.F.R. § 45.735–12(b) and (c):

"(b) No employee shall receive compensation or anything of monetary value for any consultation, lecture, teaching, discussion, writing, or appearance the subject matter of which is devoted substantially to the responsibilities, programs or operations of the Department, or which draws substantially on official data or ideas which have not become part of the body of public information.

"(c) No employee shall engage, whether with or without compensation, in teaching, lecturing or writing that is dependent on information obtained as a result of his Government employment except when that information has been made available to the general public or when the Deputy Attorney General gives written authorization for the use of nonpublic information on the basis that the use is in the public interest."

(Defs.' Brief on Rule 6(e) and Contractual and Fiduciary Duties at 17–18) (hereinafter "Defs.' Rule 6(e) Brief").

Defendants urge that the Court apply these regulations to Toobin. Independent Counsel Walsh obtained a parallel appointment from the Attorney General and from the Independent Counsel statute, which is set forth at 28 C.F.R. §§ 600.1–600.5, 601.1. (Defs.' Rule 6(e) Brief at 18 n.*). The Independent Counsel, therefore, is " 'within' the Department [of Justice], though free of ongoing supervision by the Attorney General." *In re Sealed Case*, 829 F.2d 50, 56 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 765 (1988). The Independent Counsel has a statutory duty to comply with the "written or other established policies of the Department of Justice respecting enforcement of the criminal laws." 28 C.F.R. § 594(f); 28 C.F.R. § 600.1(f).

■ Defendants argue, then, that under the regulations at issue, Toobin had a legal obligation, as an employee of the OIC, not to disclose nonpublic information concerning the work of the OIC without the authorization of the OIC. Although Toobin no longer is an employee of the OIC, that obligation is said to continue, especially since he currently is an employee of the Department of Justice. (Defs.' Rule 6(e) Brief at 19).

The Court finds that defendants themselves have set forth the reasons why Toobin should be found not to have violated these regulations. Defendants state,

"In order for information to become part of the 'body of public information,' and therefore subject to publication under the regulations, it is not enough for there to have been public references to some part of the information, rather the Government itself must have placed the information into the public domain. *See, e.g., Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1371 (4th Cir.), *cert. denied*, 421 U.S. 908 [95 S.Ct. 1555, 43 L.Ed.2d 772] (1975)."

(Defs.' Rule 6(e) Brief at 19 n. *). The Court has found that plaintiffs have shown through ample support that the information contained in the manuscript of *Opening Arguments* has been placed into the public domain by the Government. The Court takes judicial notice that through the live television coverage of the public Senate Committee hearings on the Iran–Contra affair, the public issuance of the Senate reports on the hearings, judicial opinions reported and unreported, and speeches made by Judge Walsh, not only has the Government placed this information into the public domain, but the public is more informed about this particular investigation than about any in the history of our Government other than, perhaps, Watergate.

■ The Court notes plaintiffs' arguments that Toobin is not subject to these federal regulations since the book was written after he left the OIC. The Court rejects this argument, based on the fact that Toobin had begun to compile the information for the book before he left the OIC, (Tr. at 60), and the fact that he is seeking to publish the book while an employee of the Department of Justice.

Despite Toobin's obligation to comply with the regulations, however, plaintiffs have shown with sufficient supporting evidence that the manuscript does not divulge information "which has not been made available to the general public" or which has "not become part of the body of public information." Those facts and opinions which are derived from Toobin's employment, and which have not been made public previously, are of minor significance and do not constitute a violation of his statutory obligations.

C. *Fiduciary and Contractual Obligations*

Defendants contend that Toobin's publication of *Opening Arguments* would con-

stitute a violation of both his fiduciary and contractual obligations to the OIC.*** Plaintiffs argue that Toobin has fully complied with any contractual or fiduciary duties owed to the OIC.

### 1. Fiduciary Duty

■ Defendants rely upon the Restatement (Second) of Agency, and *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) in support of their argument that publication of *Opening Arguments* would violate Toobin's duty to the OIC under common law rules.

The Restatement (Second) of Agency § 396(b) and (c) (1958) provides in pertinent part as follows:

"Unless otherwise agreed, after the termination of the agency, the agent:

. . . .

(b) has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. . . .

(c) has a duty to account for profits made by the sale or use of trade secrets and other confidential information, whether or not in competition with the principal. . . ."

Defendants argue that this fiduciary obligation is heightened by the fact that Toobin seeks to reveal confidential information taken from documents which Toobin took with him when he left the employ of the OIC. (Defs.' Rule 6(e) Brief at 21 n. *).

Defendants further contend that *Snepp* supports the application of this fiduciary duty to Toobin. Snepp, a former CIA agent published a book about CIA activities in South Vietnam. As an express condition of his employment with the CIA, however, Snepp had agreed to submit for prepublication review and approval any information relating to the CIA which he obtained during or after the term of his employment. The Government conceded that the book contained no classified information, but argued that Snepp had violated his obligation to submit all material for prepublication review. That failure, the Government argued, constituted a breach of trust, and the Court agreed. In a footnote, the Court stated as follows:

"Mr. Justice Stevens concedes that, even in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment. . . . He also concedes that all personal profits gained from the exploitation of such information are impressed with a constructive trust in favor of the employer. . . . In this case, he seems to think that the common law would not treat information as 'confidential' unless it were 'classified.' . . . We have thought that the common-law obligation was considerably more expansive. *See, e.g.,* Restatement (Second) of Agency §§ 396(c), 400 and Comment c, 404 and Comments b, d (1958); 5 A. Scott, Trusts § 505 (3d ed. 1967). But since this case involves the breach of a trust agreement that specifically required the [p]republication review of all information about the employer, we need not look to the common law to determine the scope of Snepp's fiduciary obligation."

444 U.S. at 514 n. 11, 100 S.Ct. at 768 n. 11.

Plaintiffs argue that the Court in *Snepp* addressed only the procedural duty of the government employee to the employing agency. The Court did not suggest, however, that the employee had "a substantive duty . . . to defer to that agency's unfet-

*** In support of their argument, defendants submit the affidavits of four able and highly respected former prosecutors, who state that disclosure of nonpublic information by prosecutors constitutes a breach of technical rules and could have a serious adverse effect upon the work of the OIC. (Defs.' Rule 6(e) Brief Exhs. A–D (Affidavits of Paul J. Curran, Esq., Arthur L. Liman, Esq., Leon Silverman, Esq. and Ha-

rold R. Tyler, Esq.)). The Court appreciates the submission of these affidavits and accepts them for the general propositions set forth in each. The Court, however, limits the use of these affidavits in this action, because none of the affiants represents that he has read the manuscript, and the information concerning the contents of the manuscript was supplied to each affiant by defendants.

tered discretion to determine whether the substance of what he wished to publish could be disclosed." (Pls.' Brief on Merits at 43). Rather, the Court noted that Snepp's contract "requires no more than a clearance procedure subject to judicial review." 444 U.S. at 513 n. 8, 100 S.Ct. at 767 n. 8.

Plaintiffs submit, and the Court finds, that Toobin complied with the clearance procedures set forth by the OIC. In doing so, Toobin made a good faith effort over a period of some twelve months to comply with his prepublication duties and the desires of his former employer.

■■■■■ The defendants' reliance on the Restatement (Second) of Agency also is challenged by plaintiffs. Plaintiffs argue that the Restatement's discussion of what constitutes "confidential" information that an agent may not disclose "rejects defendants' absurdly broad approach." (Pls.' Brief on Merits at 46). The type of information referred to as "confidential" by the Restatement is information that, through its subsequent use, would injur the business of the principal. Plaintiffs argue that the language of the Restatement is directed to "commercial activity and competition between rival businesses." (*Id.* at n. 18). The Court agrees. *See, e.g., Abbott Redmont Thinlite Corp. v. R. Redmont,* 475 F.2d 85 (2d Cir.1973); *Consolidated Brands, Inc. v. Mondi,* 638 F.Supp. 152 (E.D.N.Y.1986). The type of information which the OIC has indicated as "confidential" or "nonpublic" is information concerning things like the methods of the prosecutors, which are common to prosecutors everywhere, the type of equipment used by the OIC, and other such inconsequential information obtained by Toobin during his employment by the OIC. The Court finds that publication of *Opening Arguments* would not constitute a violation of Toobin's fiduciary duty to the OIC, nor would it give rise to a cause of action for a constructive trust on his revenues from publication.

### 2. Contractual Obligations

Defendants submit that Toobin has an express contractual obligation due to the fact that on the day he left the employ of the OIC, May 4, 1989, he acknowledged that duty by signing a Non–Disclosure Agreement (the "OIC Agreement"). The consideration for the OIC Agreement, defendants contend, was supplied by the fact that Toobin was permitted, on May 3, 1989, to take OIC documents with him without further review. In addition, the OIC Agreement was basically an acknowledgment of a pre-existing duty to maintain confidentiality. Finally, the fact that Toobin signed the OIC Agreement without objection estops him from now contesting its validity. (Defs.' Rule 6(e) Brief at 23 n.*).

Plaintiffs argue, however, that Toobin has fulfilled any contractual obligation he had to the OIC. Pursuant to the "Sensitive Compartmented Nondisclosure Agreement," which he signed on May 4, 1989, Toobin twice submitted his entire manuscript to the CIA for its prepublication review for classified information. After each review, the CIA found that the manuscript contained no classified information. (Toobin Aff. ¶¶ 3 & 5 and Exhs. 2 & 4). As to the OIC Agreement, plaintiffs contest its validity on several grounds: First, if the OIC Agreement is construed to penalize disclosure of "unclassified" information, plaintiffs argue that it is void because it is in contravention of Toobin's First Amendment rights. Second, defendants waived any rights they may have had to enforce the agreement by failing to specify their objections to the manuscript promptly upon receiving it. Third, they say that the OIC Agreement is void for lack of consideration. (Pls.' Rule 6(e) Brief at 30–32).

#### a. *First Amendment and Timely Objections*

■■■■ Plaintiffs argue that Toobin did not forfeit his First Amendment rights when he accepted government employment, and that the OIC may not use the OIC Agreement to impose unconstitutional conditions on his employment. Further, plaintiffs submit that defendants have waived any objections to the manuscript by failing timely to set forth specific objections.

In *McGehee v. Casey,* 718 F.2d 1137 (D.C.Cir.1983), the court reviewed the

CIA's classification and censorship scheme to determine whether it violated the First Amendment. The court found the CIA classification and censorship scheme to protect "critical national interests," and that the "district court ... properly gave deference to the CIA's detailed and reasoned explanation of its classification decisions." 718 F.2d at 1139. The *McGehee* court set forth the standard of review in this type of case:

"(1) when balanced against the first amendment interest in public disclosure of former agents' writings, the CIA scheme of classifying and censoring 'secret' information is constitutional because (a) the government has a substantial interest in assuring secrecy in the conduct of foreign intelligence operations, and (b) the criteria for what constitutes 'secret' information are neither overbroad, considering the governmental interest the scheme protects, nor excessively vague, considering the particularity with which the criteria offer guidance to the censor; (2) in reviewing whether specified information reasonably could be expected to cause actual serious harm if divulged, courts should accord deference to the CIA's reasoned explanation of its classification decision; and (3) in this case, the CIA properly classified the censored portions of McGehee's article."

718 F.2d at 1140. Plaintiffs submit that, applying these standards to the OIC's prepublication review in this case leads to the conclusion that the OIC's review process is "excessively vague" and devoid of "reasoned explanation." The OIC's prepublication review, then, is said to be unconstitutional.

The *McGehee* court found that the secrecy agreement signed by McGehee "does not extend to unclassified materials or to information obtained from public sources. The government may not censor such material, 'contractually or otherwise.'" 718 F.2d at 1141. The court stated further that "[a]n ex-agent should demonstrate, however, at an appropriate time during the prepublication review, that such information is in the public domain." *Id.* at 1141 n. 8. The court stated, "The government has

no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." *Id.* at 1141.

Plaintiffs submit first that the majority of information set forth in the manuscript is in the public domain, and therefore cannot be censored by the government. The Court agrees that plaintiffs have submitted sufficient and overwhelming evidence of this previous public disclosure.

Plaintiffs also argue that the OIC's classification of the material as "Rule 6(e)" and "nonpublic" is too vague to withstand judicial scrutiny. Further, plaintiffs submit that even when ordered by the Court to state with particularity their concerns with the manuscript, the OIC offered vague, unparticularized objections. The Court agrees.

Unlike *McGehee*, where the court found the CIA guidelines for classification of material as "Top Secret," "Secret," and "Confidential," to be "sufficiently precise to withstand a challenge for unconstitutional vagueness," the Court in the instant case has found no such precision in the OIC's objections. As stated above, much of the material labeled as violative of Rule 6(e) has been found not to disclose Rule 6(e) material. Further, the information labeled as "nonpublic" often is taken verbatim from Senate reports and other reliable sources. Also disturbing is the OIC's inclusion as objectionable material Toobin's opinions, observations concerning the physical appearances of his co-workers and his common everyday prosecutorial activities. The OIC's annotations and objections therefore are far from precise.

In addition, the Court is disturbed by the lack of clarity in the comments made to Toobin by the OIC after having reviewed his manuscript. Toobin was told that he needed to obtain the approval of the OIC. (Stip. Exhs. 9, 20, 22, 25, 26, 27, 29, 30, 31, 33, 36). He also was told that he would need to obtain CIA clearance. (Stip. Exhs. 20, 24, 26). When Toobin did obtain the

approval of the CIA, he was chastised by the OIC for having done so without its permission. (Stip. Exh. 36). Further, after having gotten approval on disclosure of portions of the manuscript, the OIC informed Toobin that that approval did not constitute complete clearance. (Stip. Exh. 24, 26, 31, 47). This is not the sort of speedy review in cases of prior restraint envisioned by the court in *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir.), where the court stated, "we think that the CIA must act promptly to approve or disapprove any material which may be submitted to it by Marchetti. Undue delay would impair the reasonableness of the restraint, and that reasonableness is to be maintained if the restraint is to be enforced," *cert. denied*, 409, U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972).

Defendants contend, however, that they have complied with *Marchetti*, which set forth that "the maximum period for responding after the submission of material for approval should not exceed thirty days." 466 F.2d at 1317. Defendants state that "[w]ithin thirty days of each submission, defendants specifically objected to the use of Rule 6(e) and nonpublic information. (Exhs. 9, 13, 20, 24, 26, 31)." (Defs.' Mem. at 30). The Court does not agree that defendants' form-letter responses to Toobin's submissions are within the spirit of *Marchetti*. The OIC has an obligation to specify its objections, even without that specific request from Toobin. The Supreme Court in *Bantam Books* stated, "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.... We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraints." 372 U.S. at 70, 83 S.Ct. at 639. As in *Bantam*, the Court finds that "the system at bar includes no such saving features." 372 U.S. at 70, 83 S.Ct. at 639. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam).

The Court concludes that the system of prepublication review by the OIC fails to comport with settled standards required in cases of prior restraint on expression of government employees, both present and former. Publication of *Opening Arguments* therefore will not violate any contractual duty owed by Toobin to defendants.

### b. *Consideration*

Plaintiffs argue that because Toobin signed the OIC Agreement on the day he left the employ of the OIC, he received nothing in exchange for it, and it therefore is void for lack of consideration. *See Marchetti*, 466 F.2d at 1317 n. 6. Defendants argue, however, that the OIC Agreement merely reaffirmed Toobin's pre-existing obligation of non-disclosure.

Having found that the system of prepublication review employed by the OIC fails to comport with applicable constitutional standards, the Court declines to reach this issue.

### *Conclusion*

Plaintiffs' application for a permanent injunction is denied. The application for a declaration that publication of *Opening Arguments* would not subject either Toobin or Penguin to liability for violation of Rule 6(e) of the Federal Rules of Criminal Procedure is granted, as is the application for a declaration that publication of the book will not violate any contractual or fiduciary duty owed by Toobin to defendants and will not give rise to a cause of action against Toobin for a constructive trust on his revenues from publication. Defendants' two counterclaims are denied.

This action having been fully resolved, it is ordered removed from the active docket of this Court.

SO ORDERED.